748 N.W.2d 83 (2008)
16 Neb. App. 459
William KIRKWOOD et al., Appellees
v.
STATE of Nebraska, Appellant, and
Shelter Mutual Insurance Company, Intervenor-Appellee.
Nos. A-05-1226, A-06-630.
Court of Appeals of Nebraska.
February 26, 2008.
*91 Jon Bruning, Attorney General, and Matthew F. Gaffey, for appellant.
Martin J. Troshynski, of Baskins, Pederson & Troshynski, North Platte, Paul J. Hickey, of Hickey & Evans, L.L.P., and Mark A. Christensen, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P, Lincoln, for appellees William Kirkwood et al.
P. Stephen Potter, P.C., Gothenburg, for appellee Ross Ostergard.
IRWIN, SIEVERS, and CASSEL, Judges.
CASSEL, Judge.

I. INTRODUCTION
The State of Nebraska appeals from the judgments of the district court for Lincoln County, following separate bench *92 trials, in favor of William Kirkwood, Robert Johnson, and Mavis Johnson (collectively Kirkwood Appellees) in case No. A-05-1226 and in favor of Ross Ostergard in case No. A-06-630 on their actions under the State Tort Claims Act, see Neb.Rev. Stat. § 81-8,209 et seq. (Reissue 2003), to recover damages sustained as a result of two separate two-vehicle collisions at an intersection where the northbound vehicles at issue did not stop. The district court determined that the State was negligent in failing to comply with the Manual on Uniform Traffic Control Devices (Manual) in placing stop signs and other warning devices at the intersection. In Kirkwood Appellees' case, the court determined that the State's negligence was the sole proximate cause of the damages sustained by Kirkwood Appellees. Approximately 7 months after the Kirkwood trial, the same district court judge held a bench trial in Ostergard's case and subsequently found that Ostergard was 40-percent negligent and that the State was 60-percent negligent. Following oral arguments in case No. A-05-1226 and pursuant to our authority under Neb. Ct. R. of Prac. 11B(1) (rev. 2006), we ordered case No. A-06-630 submitted without oral argument. We have consolidated these cases for purposes of opinion and disposition, and we affirm the district court's judgment in each case.

II. BACKGROUND

1. INTERSECTION
The accidents at issue occurred at the intersection of a road called Newberry Access (Newberry Road) and U.S. Highway 30, which intersection is located at the east corporate limits of North Platte, Nebraska. Newberry Road runs north and south and has a speed limit of 55 miles per hour on the south leg and 50 miles per hour on the north leg. The north leg is also Highway 30, but to avoid confusion, we will refer to that section of the road as the north leg. Highway 30 runs east and west, and the speed limit is 60 miles per hour. The intersection was formerly a T-intersection, requiring a northbound traveler on the south leg of Newberry Road to turn onto Highway 30 at the intersection, and it is a "wide-throat intersection," meaning that it has a large turning radius to accommodate drivers turning right. In September 2002, the north leg opened for travel.
The terrain on the south leg of Newberry Road is fairly flat, and the road has a slight curve. A topography survey conducted in March 2005 showed that the south leg of Newberry Road sloped upward as it approached the intersection. Highway 30 is mostly level, but it is "super elevated" to keep the high-speed traffic from running off the curvature of the road. The elevation of Highway 30 at the intersection is lower than the grade of the south approach of Newberry Road. The north leg is elevated over railroad tracks.
A traffic engineering analyst for the Nebraska Department of Roads (DOR) testified that the north leg "might be a distraction" to a northbound driver. He explained that such a driver might think the grade separation where the north leg passes over the railroad is actually a highway interchange and would then expect the intersection to be closer to the grade separation. He testified that a northbound driver does not see Highway 30 pass through the intersection, partly because it is a superelevated curve. A deputy sheriff with the Lincoln County sheriff's office testified that a driver approaching the intersection from the south leg of Newberry Road would see, from a distance, the north leg but would not see Highway 30. But he testified that Highway 30 would be apparent once a *93 driver reached the stop signs at the intersection. North Platte Police Chief Martin Gutschenritter testified that an individual involved in an accident at the intersection called to share his concerns and told Gutschenritter that he was "`mesmerized by that overpass'" and that he thought Newberry Road "`was a straight shot through.'"

2. SIGNAGE AND SIGNAGE PLANS FOR INTERSECTION
Traffic on Highway 30 does not stop or slow at the intersection. For the benefit of drivers approaching the intersection on the south leg of Newberry Road, there is a sign on the right side of the road designating a stop ahead with a plaque underneath that states "1500 FT." Approximately 500 feet later, a junction sign is located on the right side of the road, showing "4th STREET" to the west (the west leg of Highway 30 is called Fourth Street) and "30" (designating the highway) to the north and to the east. An unspecified distance later, the words "STOP AHEAD" appear on the pavement. Then, a highway direction and distance sign is posted on the right side of the road, showing that North Platte is to the west and that an airport and Gothenburg, Nebraska, are a certain number of miles to the east. At the intersection, a stop sign is located in what appears to be the center of an island on the left side of the road and another stop sign is located an unspecified distance from the shoulder on the right side of the road. Pictures in the record show two reddish-orange flags protruding from the top of each stop sign.
According to the March 2002 signing plan of the DOR, rumble strips were intended to be placed on the south leg of Newberry Road by the time the north leg opened. The strips were to be placed approximately 100 feet before the stop ahead sign. The rumble strips were not in place at the time of the accidents. Nor was there a stop line, a solid white line used to indicate the point behind which vehicles are required to stop, on the pavement. The signing plan did not show a stop line or the "STOP AHEAD" pavement marking, but a "notes" section on the plan contained the statement, "ANY PAVEMENT MARKING SHOWN IS FOR INFORMATION ONLY."
Lester O'Donnell, a district highway engineer for the DOR, raised concerns to others within the DOR about the plans for the intersection. Specifically, O'Donnell wanted stop control on Highway 30 and through traffic on Newberry Road. O'Donnell testified that he had recommended placing overhead stop signs at the intersection. The DOR determined that Highway 30 would not have stop control at the intersection, and the roadway design engineer in charge of the roadway design division of the DOR testified that the determination meant that the DOR would not have to reconstruct Highway 30. He explained that because travelers on Newberry Road would be stopping, they could then cross the superelevated curve of Highway 30 comfortably and safely at a low speed.
Jess Abasolo, a highway maintenance superintendent with the DOR, testified about his experience driving through the intersection, which he did at least once every other week. He testified that as he approached the stop ahead sign, he could turn his head, look forward toward the intersection, and see the stop signs. With regard to an exhibit that shows the stop ahead sign and the view looking north, Abasolo testified that he could not "make a clear picture" of the stop sign on the right side of the road and could not see the roadway of Highway 30 as it passed through the intersection. Abasolo testified that in looking at a photographic exhibit taken over 1,000 feet from the intersection, *94 he could not see the stop sign on the right side of the road or the roadway of Newberry Road as it crossed Highway 30, but he could see the north leg of Newberry Road. With regard to a different photographic exhibit which showed the words "STOP AHEAD" on the pavement, Abasolo testified that a person located where the photograph was taken would be anywhere between 500 and 1,000 feet from the intersection when viewing the words. In looking at that exhibit, Abasolo testified that he could not see the roadbed of Highway 30 as it passed through the intersection, but that he could see the right-hand stop sign, stating, "The shape I can't tell. I just see the speck of red in there."

3. KLRKWOOD-OSTERGARD COLLISION
On October 10, 2002, at approximately 9:14 p.m., a collision occurred at the intersection. Kirkwood and his passenger were traveling west on the east leg of Highway 30, and Ostergard and his passenger, Julie Thomlison, were traveling north on the south leg of Newberry Road. No citations were issued as a result of the accident. Prior to the Kirkwood trial, Kirkwood recovered $300,000 from Ostergard's insurance company and $100,000 under a provision of Kirkwood's insurance policy.
Thomlison testified that she had been with Ostergard through the same intersection at issue on two prior occasions. Thomlison testified that on the night of the accident, she could not get Ostergard to concentrate on his driving and Ostergard ran two red lights after they left a truckstop and just prior to the collision. Thomlison testified that as Ostergard's vehicle approached the intersection, Ostergard did not slow at all and did not look to the right or the left. Thomlison testified that she was upset with Ostergard over the accident and that she did not remember "a whole lot" of the accident. She admitted testifying in her deposition that she did not remember seeing a stop sign or an intersection and that "`[t]he only thing [she] remember[ed was] laying [sic] on the ground.'"
Ostergard testified only in case No. A-06-630. He testified that he had driven through the intersection when it was a T-intersection, which required him to stop before proceeding onto Highway 30. Ostergard denied running any stop signs or stop lights on the night of the accident on the way to the truck-stop with Thomlison, but did not address whether he had done so after leaving the truckstop. He had no recollection of the events after leaving the truckstop other than proceeding north on Newberry Road.

4. JOHNSON-PODOLL COLLISION
At approximately 10:25 a.m. on October 18, 2002, Coloradan Dean Podoll was traveling northbound on the south leg of Newberry Road with his wife. A collision occurred when Robert Johnson turned left from the north leg of Newberry Road onto Highway 30. A witness testified that Podoll's vehicle was traveling at a "pretty high speed" and did not slow at all. Podoll believed that he was driving under the speed limit.
Podoll testified in his deposition that as he approached the intersection, he did not see warning or stop signs due to a "truck/trailer" turning left. Podoll testified that he did not see the stop ahead sign. He testified, "[T]here was something parked on the right-hand side of the road back further, too; but I couldn't tell you what it is or whereabouts it was or anything like that." Podoll knew he was approaching the junction of two roads, but he believed he had the right-of-way because the north leg was a bypass to get around North Platte and because he could "see far enough ahead to where the road continued, no forewarning signs." Podoll testified that he first noticed the stop signs *95 after the accident and that he observed them from the back while he was out of his vehicle. Podoll testified that he told a police officer who had arrived at the scene, "`That stop sign needs more forewarning or needs to be better marked earlier.'"

5. NOTICE OF CONCERN ABOUT INTERSECTION
On October 14, 2002, Lincoln County Sheriff Jim Carman wrote a letter to O'Donnell stating in part, "[T]he stop signs which were placed to the right side of the road are so far to the right that they may not be noticed by someone intending to proceed on north or south across Highway #30." On October 15, Gutschenntter wrote a letter to O'Donnell about the intersection because, as he later testified at trial, people "were getting killed and they were getting seriously injured, and it was the frequency that disturbed [him] considerably." Gutschenntter called the intersection "suicidal."
After the accidents, on December 6, 2002, the DOR traffic engineering analyst who would later testify wrote a memorandum to the state traffic engineer concerning the intersection, which memorandum stated in part:
Sheriff Carman noted the STOP sign on the south leg may be placed too far to the right to be noted by drivers. Photos taken by our data collector shows [sic] this could be a problem. The [Manual] indicates the STOP sign should be 12 feet from the edge of the pavement. The STOP sign on the right and the STOP sign on the median should be moved closer to the traffic and STOP bars should be added.

6. MANUAL
The DOR approved rules and regulations which adopted the 1988 edition of the Manual. These rules and regulations were approved and filed with the Nebraska Secretary of State on November 4, 1994, and are codified in the Nebraska Administrative Code as title 411, chapter 1. These regulations were in full force and effect at the time of the accidents.
Section 1A-5 of the Manual addresses the meanings of "shall," "should," and "may" as those terms are used in the Manual:
1. SHALL-a mandatory condition. Where certain requirements in the design or application of the device are described with the "shall" stipulation, it is mandatory when an installation is made that these requirements be met.
2. SHOULD-an advisory condition. Where the word "should" is used, it is considered to be advisable usage, recommended but not mandatory.
3. MAY-a permissive condition. No requirement for design or application is intended.
Two experts provided testimony regarding the Manual: Eugene M. Wilson, a consultant in traffic engineering safety and education, testified on Kirkwood Appellees' behalf, and James L. Pline, a consulting traffic engineer, provided testimony for the State. Wilson testified that some of the research that he conducted was incorporated in the 1988 edition of the Manual, specifically in the area of symbol sign evaluation. Pline participated in the development of the 1988 Manual, principally in the areas of regulatory and warning signs.
Wilson testified that the reason for the distinction between "shall" and "should" is the existence of circumstances in the field that require the adjustment of the placement of traffic control devices, such as slopes and guardrails. Wilson testified, "The reason these guidelines are placed there as recommendations and provided as Should conditions is based on scientific *96 based study. It doesn't say ignore these Should advisory conditions."

(a) Stop Signs
The Manual provides that the standard size of a stop sign shall be 30 by 30 inches, but that a larger size is recommended where greater emphasis or visibility is required. Both stop signs at the intersection were 36 by 36 inches.
Section 2A-21 of the Manual discusses standardization of location of signs in general:
Standardization of position cannot always be attained in practice; however, the general rule is to locate signs on the right-hand side of the roadway, where the driver is looking for them.... Signs in any other locations ordinarily should be considered only as supplementary to signs in the normal locations.
Section 2B-9, the section of the Manual addressing location of stop signs in particular, states: "A STOP sign should be erected at the point where the vehicle is to stop or as near thereto as possible, and may be supplemented with a Stop line and/or the word STOP on the pavement..." With respect to the lateral clearance of signs, section 2A-24 of the Manual states in part, "Signs should have the maximum practical lateral clearance from the edge of the traveled way for the safety of motorists who may leave the roadway and strike the sign supports." Section 2A-24 further provides, "Normally, signs should not be closer than 6 feet from the edge of the shoulder, or if none, 12 feet from the edge of the traveled way."
Daniel J. Waddle, a traffic control engineer in the DOR's traffic engineering division, testified that the DOR's practices with regard to the placement of stop signs are "[g]enerally to try to follow the guidelines of the [Manual], placing the stop sign... at the location a vehicle is intended to stop at; and for lateral, you know, placing them  if the [M]anual says six to twelve feet outside the shoulder or travel lane." Waddle testified that at the intersection, the stop sign on the left was placed in a "typical" island placement, which is 2 to 4 feet inside the island, centered on the nose of the island.
Wilson opined that the stop sign on the right side of the south leg of Newberry Road did not comply with the Manual "[b]ecause it's clearly not visible" and "[i]t's not located where the motorist is supposed to stop." He testified that the stop sign "clearly did not comply with recommended practice, the Should requirements associated with the Manual ... which are advisory." Wilson testified that figure 2-2 in the Manual, illustrating placement of stop and yield signs at a wide-throat intersection, showed the typical placement of a stop sign to be 12 feet from the road. Figure 2-2 is labeled "[t]ypical locations for stop signs and yield signs," but section 2A-21, addressing standardization of location, states, "Standard positions for a number of typical signs are illustrated in figures 2-1 to 2-4." Wilson testified that the placement of the stop sign on the right by the DOR was "clearly in excess of that by orders of magnitude." He stated, "It's not readily in the cone of vision of the motorist, it does not command motorist attention. That is a significant failure." He testified that the failure to move the stop sign closer to the road "significantly contributed to these accidents."
In a deposition, David B. Daubert, an engineer, testified, "According to ... Wilson, the Stop sign [on the right] was not located appropriately. I can't tell you where it was located. I'm basing [Daubert's earlier statement that the sign was `hard for the driver to find'] on [Wilson's] analysis that the Stop sign was too far to the right." When shown a picture of the *97 stop signs at the intersection, Daubert testified, "That Stop sign is worse than I had ever imagined." When asked whether the stop signs were conspicuous, Daubert testified that the sign on the left was but that he was "not sure" if the sign on the right was conspicuous. He testified that the Manual stated that a stop sign should be placed in the driver's cone of vision rather than 12 feet from the edge of the road. Upon viewing a particular exhibit, Daubert testified that he could see the "STOP AHEAD" pavement marking and could see the stop sign located in the median in the same field of vision. He could not cite to any reason why a reasonably attentive driver would not be able to see the pavement marking and that stop sign.
Pline opined that the DOR fully met the provisions of the Manual with regard to the placement of the stop signs at the intersection. He testified that under the Manual, a stop sign on a wide-throat intersection "goes farther to the right in relation to the approach to the intersection." And Pline testified that when a stop sign is placed farther to the right, the Manual recommends installing a supplemental stop sign on the left for the benefit of drivers approaching the intersection who are either making a left turn or proceeding straight across the intersection. Pline testified that he looked at the devices along the south approach to the intersection and that a driver would readily "pick up" the traffic control devices, including the right-side stop sign, within a 10-degree cone of vision.

(b) Stop Ahead Sign and Pavement Marking
Section 2C-15 of the Manual provides that "[a] STOP AHEAD sign is intended for use on an approach to a STOP sign that is not visible for a sufficient distance to permit the driver to bring his vehicle to a stop at the STOP sign" and that "it may be used for emphasis where there is poor observance of the STOP sign." The Manual contains a table on the advance placement of warning signs, setting forth in section 2C-3 the "suggested minimum sign placement distances." For a stop condition on a road such as the south leg with a posted speed of 55 miles per hour, the minimum sign placement distance is 450 feet. Pline testified that he served on the task force that developed the original table in the 1970's and that he actually wrote the text and revised the table that were included in the 1988 Manual. He testified that the Manual did not contain criteria addressing maximum distance.
Wilson testified that the stop ahead sign, located 1,500 feet in advance of the stop location, was "three times further" away than it should be and that "it really loses its effectiveness." He testified that the advance location needed to be around 550 feet where the speed limit was in the neighborhood of 60 miles per hour. Daubert testified in his deposition that at 55 miles per hour, a driver's primary focus would be between 1,200 and 1,400 feet ahead. He testified that a driver, after driving by the stop ahead sign placed 1,500 feet in advance of the stop condition, would be focusing right at about where the stop sign would be located. Pline testified that the stop ahead sign in this case was given a "normal placement." He further testified that the Manual did not require a stop ahead sign for the intersection because "there was sufficient visibility and sight distance so the stop signs could be seen, but the Stop Ahead was put in as an ... additional device to help the driver recognize the stop condition." Pline testified that the Manual did not require the "STOP AHEAD" pavement marking.

(c) Stop Line
Regarding stop lines, section 3B-17 of the Manual states in part, "If a stop line is *98 used in conjunction with a STOP sign, it should ordinarily be placed in line with the STOP sign. However, if the sign cannot be located exactly where vehicles are expected to stop, the Stop line should be placed at the stopping point." In section 3B-20 addressing pavement word and symbol markings, the Manual states, "The word `STOP' shall not be used on the pavement unless accompanied by a stop line ... and STOP sign...."
Wilson testified that a stop line was needed at the intersection. He pointed out that the illustration in the Manual of stop sign placement at a wide-throat intersection showed a stop line. Pline testified that the Manual required a stop line when a "STOP" pavement marking was used, but not when a "STOP AHEAD" pavement marking was used. He explained that the Manual on this issue "was somewhat subject to interpretation" because it did not specify whether the stop line is mandated "when you use solely the word Stop or when you use Stop in itself[,] ... and it didn't address what happens with a Stop Ahead sign." Pline initially agreed with Wilson's opinion: During Pline's deposition on December 23, 2004, he said, "`The absence of a stop line is the only [Manual] compliance issue.'" But Pline testified that he later thought such an interpretation did not "sound reasonable" and was not borne out by what he had "seen in the field." He testified that he reviewed the Manual and e-mailed "the chairman of [the] markings technical committee" asking whether he agreed with Pline's later interpretation that a stop line was not needed with a "STOP AHEAD" pavement marking. Pline testified that the chairman's response concurred with Pline's later interpretation and that Pline then notified counsel that he was incorrect in his deposition.

7. DISTRICT COURT'S JUDGMENT

(a) Case No. A-05-1226
On July 18, 2005, the district court entered judgment against the State. The court found that all the experts who testified were clearly qualified to render opinions, that the opinions were based on scientifically valid and reliable considerations, and that all the expert testimony was more probative than prejudicial. The court stated that it did not receive as expert testimony the testimony of Carman or Gutschenritter, or O'Donnell or any other employee of the DOR, and that it "accept[ed] the testimony of all of these witnesses only to show that the State ... received notice concerning possible dangers involving the intersection and the potential problems to be addressed."
The district court stated that the State had not waived its sovereign immunity with regard to the design of roadways and that the court did not question the design aspects of the intersection or the determination as to which traffic control devices to use at the intersection because such matters clearly fell within the discretionary function exception to the State Tort Claims Act. The court stated that it "is clear that the overpass ascending north of the intersection is a visual distraction to drivers" and that the signing plan called for rumble strips to be placed on Newberry Road "bracketing the `stop ahead' sign in order to warn motorists." The court continued, "While the rumble bars are not governed by the [Manual], it is clear that the State... determined that they should be placed on the approach to the intersection." The district court further stated:
The issues presented to the Court are whether ... the State ... fully complied with the [Manual], and, if not, whether such failure constituted negligence that proximately caused the accidents and injuries to the [Kirkwood Appellees].

*99 A review of the evidence ... makes it clear that the right-hand stop sign was to the right of the expansion joint a significant distance from the right-hand edge of Newberry [Road]. This stop sign had been in place prior to the opening of the intersection and appears to the Court to be angled towards traffic turning right on to [sic] U.S. Highway 30. This placement does not comply with the [Manual] and the standard of placement of stop signs laterally from the edge of the highway at 12 feet. Figure 2-2 on page 2A-15 of the [Manual] shows a wide throat intersection with the clearance of the stop sign 12 feet from the right edge of the roadway. That diagram also shows a stop bar painted on the pavement....
In addition, the [Manual] sets a standard for placement of warning signs, such as the "stop ahead" sign in this case. On a roadway with a 55 miles per hour speed limit, it should be 450 feet from the actual stop condition. In the instant case, the sign was 1500 feet from the stop condition. In addition, the [Manual] in Section 3B-20 states that the word "stop" shall not be used on the pavement unless accompanied by a stop line or stop bar.
The district court found Wilson's testimony to be "fully credible" and compelling. The court stated that it could not find that Pline devoted as much time to the study of the inter-section as did Wilson, that it was clear that Pline changed his opinion on the necessity of a stop line at the intersection, and that the court did not give the same weight to Pline's testimony and opinions as it did to the testimony of Wilson. The court accepted Wilson's testimony that the use of "should" in the Manual was never intended to be merely a suggestion but was adopted to allow leeway for road departments to comply with the Manual as closely as practicable.
The district court found ample evidence of negligence on the part of the State in its failure to comply with the Manual in the signage for the intersection. The court found that the State was negligent and in breach of its duty to the traveling public by its failure to place the right-hand stop sign in accordance with the Manual, in its failure to place the stop ahead sign within 500 feet of the intersection, in its failure to place a stop line at the intersection, and in its failure to place rumble strips on the south leg of Newberry Road. The court found such negligence to be the proximate cause of the accident and resulting injuries to Kirkwood Appellees. The district court entered the following money judgments against the State: $1,640,791.28 for Kirkwood, $1,458,975.82 for Robert Johnson, and $300,000 for Mavis Johnson.

(b) Case No. A-06-630
The matter came on for trial on January 31, 2006. The parties stipulated that they would submit the record of the Kirkwood trial as to the issue of liability and that such record "may be entered subject to the same objections that were made at the [Kirkwood] trial ... and subject to the same rulings that were made by the Court in the Kirkwood trial." On March 23, the district court entered an amended order, finding the State negligent in its signage of the intersection by failing to have the stop signs located in the proper manner and in its failing to place rumble strips on "the highway" (meaning Newberry Road) prior to the intersection. The district court stated:
The State ... raised an issue in regard to the testimony of ... Wilson in the [Kirkwood] trial ... which has been received in evidence in this trial. Assuming, arguendo, this Court should not consider the testimony of ... Wilson in regard to the placement of the "stop *100 ahead" sign, and [sic] there is still sufficient evidence of the State's negligence to hold [it] responsible for the accident that occurred in this case. Again, the Court specifically finds that the State was negligent in the placement of the stop signs and in the failure to place the rumble bars upon [Newberry Road] to give warning to any driver approaching the intersection.
It is apparent from the evidence that [Ostergard] himself was negligent in failing to stop at the stop sign as he entered the intersection with Highway 30. [Ostergard] had a duty to obey all traffic signs and to drive so as to not endanger other drivers, his passenger, or himself.
When comparing the two, the Court finds that the duty of the State ... is greater than that of [Ostergard] in light of [the State's] overall obligation to protect all members of the traveling public by the way [it] conduce[s its] business. The negligence of the State ... in this case, compared to the negligence of [Ostergard,] is greater. The Court assigns the negligence of the State ... at 60 percent and the negligence of [Ostergard] at 40 percent.
The court found that Ostergard suffered damages of $204,817.98, and after reducing that amount by 40 percent, it entered judgment in favor of Ostergard in the amount of $122,890.78.

III. ASSIGNMENTS OF ERROR
In both cases, the State alleges that the district court erred in (1) failing to adequately perform its duty as a gatekeeper by (a) overruling the State's motion to determine admissibility of evidence concerning the expert opinion testimony offered against the State, (b) failing to make specific findings on the record as to why the court believed the experts' methodology was reliably applied, and (c) admitting and relying on opinion testimony from Wilson and Daubert that was unreliable and lacked a sufficient engineering basis; (2) failing to apply the appropriate standard of care; (3) failing to find that the negligence of Ostergard was the proximate cause of the collision with Kirkwood; (4) finding that the State was liable based on evidence that (a) the overpass to the north of the intersection created a visual distraction, (b) there were no rumble strips, and (c) there was no stop line; and (5) failing to find that the State retained its sovereign immunity in (a) placing the stop ahead sign, (b) placing the "STOP AHEAD" pavement marking, and (c) constructing a viaduct that was visible from the intersection.
In case No. A-05-1226, the State additionally alleges that the district court erred in (1) failing to find that Podoll's negligence was the proximate cause of the collision with Robert Johnson, (2) finding that the State was liable based on evidence that Kirkwood sustained a loss of earning capacity as a result of the accident, and (3) overruling the State's motion to compel and motion to quash.

IV. STANDARD OF REVIEW
An appellate court reviews the record de novo to determine whether a trial court has abdicated its gatekeeping function. Fickle v. State, 273 Neb. 990, 735 N.W.2d 754 (2007).
Whether a witness is qualified as an expert is a preliminary question for the trial court. State v. Tolliver, 268 Neb. 920, 689 N.W.2d 567 (2004). A trial court is allowed discretion in determining whether a witness is qualified to testify as an expert, and unless the court's finding is clearly erroneous, such a determination will not be disturbed on appeal. Id.
In proceedings where the Nebraska rules of evidence apply, the admission *101 of evidence is controlled by rule and not by judicial discretion, except where judicial discretion is a factor involved in assessing admissibility. Epp v. Lauby, 271 Neb. 640, 715 N.W.2d 501 (2006). A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. Id.; Schafersman v. Agland Coop, 262 Neb. 215, 631 N.W.2d 862 (2001). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. Epp v. Lauby, supra.
A district court's findings of fact in a proceeding under the State Tort Claims Act will not be set aside unless such findings are clearly erroneous. Fickle v. State, supra.
Whether the allegations made by a plaintiff constitute a claim under the State Tort Claims Act or whether the allegations set forth a claim that is precluded by the exemptions set forth in the act are questions of law. Fickle v. State, supra.
The question whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. Id.
The district court's interpretation of the Manual presents a question of law. Tadros v. City of Omaha, 269 Neb. 528, 694 N.W.2d 180 (2005). When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. Id.

V. ANALYSIS

1. COURT'S PERFORMANCE OF DUTY AS GATEKEEPER
The State argues that the district court failed to adequately perform its duty as a gatekeeper by overruling the State's motion for determination of the admissibility of evidence in each case, failing to make specific findings on the record as to why the court believed the experts' methodology was reliably applied, and admitting and relying on opinion testimony from Wilson and Daubert that was unreliable and lacked a sufficient engineering basis. In its brief on appeal, the State argues that the court erred in admitting testimony from Wilson and from Daubert  who did not know the location of the right-side stop sign and merely relied on Wilson's assessment that it was located too far to the right  because such testimony was based on incorrect assumptions of fact in that Wilson did not reliably apply the correct provision of the Manual and in that Wilson's interpretation of various provisions of the Manual conflicted with the plain language of the Manual. The State asserts that the district court "made no finding on the reliability factors it relied on in overruling the State's Motion." Brief for appellant in case No. A-05-1226 at 26.
In case No. A-05-1226, the State filed on June 13, 2005, a motion for determination of the admissibility of evidence, requesting that the district court determine, as a preliminary matter, that certain testimony of Kirkwood Appellees' expert witnesses was inadmissible under Neb.Rev. Stat. § 27-702 (Reissue 1995) and Schafersman v. Agland Coop, supra. On June 22, the district court overruled the motion, stating, "The Court finds, despite its comments earlier to the contrary, that the parties will simply call their witnesses and lay the foundation necessary for their opinions to be given. The Court sees no need to conduct a separate hearing prior to the introduction of evidence."
In case No. A-06-630, on September 8, 2005, the State filed a motion for determination *102 of the admissibility of evidence, requesting the court to determine that certain testimony of Wilson, Daubert, and other witnesses was inadmissible. On January 17, 2006, the court overruled the motion without explanation. On January 31, the day trial commenced, the State filed a second motion for determination of the admissibility of evidence, seeking a determination that the anticipated testimonies of Wilson and Daubert were inadmissible. The State alleged that the opinions expressed by Wilson in the excerpts of his deposition that the State attached to its motion misrepresented the standard of care in traffic engineering. Specifically, the State alleged Wilson had testified that figure 2-2 of the Manual depicted the required signing practices for a wide-throat intersection, based on section 2A-21 of the Manual, which it alleged Wilson believed provided an industry standard by use of the words "`standard positions for a number of typical signs are illustrated in figures 2-1 to 2-4.'" The State attached an affidavit of Waddle, who stated therein that the Manual is periodically updated with "Errata Notifications" for correction of errors and omissions. Waddle attached to his affidavit a copy of a 1992 "errata sheet" for the Manual that he obtained from the Federal Highway Administration which showed the following correction: "Page 2A-8, Section 2A-21, Standardization of Location. Modify last paragraph to read, `Typical placement for a number of signs is illustrated in Figures 2-1 to 2-4.'" The State discussed the motion at the beginning of trial, and the court stated that it would take the motion under advisement because the court had not had a chance to look at it.
When a court is faced with a decision regarding the admissibility of expert opinion evidence, the trial judge must determine at the outset, in accordance with Neb. Evid. R. 702, whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. Fickle v. State, 273 Neb. 990, 735 N.W.2d 754 (2007); Schafersman v. Agland Coop, 262 Neb. 215, 631 N.W.2d 862 (2001). This entails a preliminary assessment to determine whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue. Id. An expert's opinion is ordinarily admissible under rule 702 if the witness (1) qualifies as an expert, (2) has an opinion that will assist the trier of fact, (3) states his or her opinion, and (4) is prepared to disclose the basis of that opinion on cross-examination. State v. Gutierrez, 272 Neb. 995, 726 N.W.2d 542 (2007).
The Nebraska Supreme Court held in Schafersman v. Agland Coop, supra, that when the opinion involves scientific or specialized knowledge, appellate courts will apply the principles of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (Daubert/Schafersman). See State v. Gutierrez, supra. Under the Daubert/Schafersman jurisprudence, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion. This gatekeeping function entails a preliminary assessment whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue. State v. Gutierrez, supra.
An appellate court reviews the record de novo to determine whether a trial court has abdicated its gatekeeping function. Fickle v. State, supra. A trial court may not abdicate its gatekeeping duty under Daubert/Schafersman in a *103 bench trial, but the court is afforded more flexibility in performing this function. Fickle v. State, supra. A trial court adequately demonstrates that it has performed its gatekeeping duty in determining the reliability of expert testimony when the record shows (1) the court's conclusion whether the expert's opinion is admissible and (2) the reasoning the court used to reach that conclusion, specifically noting the factors bearing on reliability that the court relied on in reaching its determination. Id. We note that a trial court is not required to always hold a hearing prior to qualifying an expert pursuant to Daubert/Schafersman. See State v. King, 269 Neb. 326, 693 N.W.2d 250 (2005). Like in Fickle v. State, supra, the district court here did not make any express findings; rather, it essentially concluded that the evidence was admissible but left open the opportunity for parties to object to such testimony at trial.
The record shows that during Wilson's testimony on direct examination, Wilson stated that he had opinions as to whether the DOR complied with the Manual in developing the intersection, and when counsel for Kirkwood Appellees asked what those opinions were, the State objected, stating:
I'll object at this point on the basis of Rule 702. [The question] calls for speculation, it calls for novel theories by this witness that have not been peer reviewed,... his method has not been reliably applied and ... there has not been sufficient evidence as to what the standard of care is in the first place to support these conclusions.
The court sustained the objection. The court stated that it needed to know the underlying scientific principles upon which Wilson relied to make the determination that the State did not properly rely on the Manual. Wilson then testified that the basic requirements of traffic control devices are that they fulfill a need, command attention, be clearly recognized, convey a clear and simple meaning, and provide adequate time for a response. Wilson testified:
[S]cientific research, research associated with message, visual acuity, research associated with motorists' comprehension of traffic control devices, motorists' recognition, eye movements, human factors are all fundamental principles that go into the Manual ... so that research and the analysis of that research, the decisions made on that research become the founding basis for the Manual... and how that information is put there.
Shortly thereafter, the record shows the following colloquy:
[Counsel for Kirkwood Appellees:] Let's take an example. I'm going to ask you to look within [the Manual]. Would you look at Section 2C?
THE COURT: No. We don't  we don't need any examples. For the purposes of complying with the Nebraska Supreme Court's decision in Shafersman relying on Daubert ..., he's qualified to give an opinion.
[Counsel for Kirkwood Appellees:] Thank you very much, Your Honor.
... Mr. Wilson, what conclusions did you draw following your study and analysis of the ... intersection regarding whether or not the [DOR] had complied with this manual 
....
[Counsel for the State:] ... I'll renew the Rule 702 Daubert/Schafersman objection, Your Honor. Particularly as to the unidentified research.
THE COURT: Overruled.
The State did not make a similar objection over the nearly 100 ensuing pages of testimony *104 by Wilson, which testimony included his opinions.
In its judgment, the court stated that the engineers who testified "were clearly qualified to render the opinions they provided based on their extensive education," that "their opinions were based on scientifically valid and reliable considerations," and that the testimony "was clearly more probative than prejudicial." The court further stated that it found Wilson's testimony to be "entirely credible" and found Wilson to be "extremely well qualified and possessing what is clearly a passion for the safety of the traveling public." The court stated, "Further, his testimony was logical, clear, and pointed and coincided with the expectations contained in the [Manual]."
On appeal, the State does not challenge Wilson's qualifications as an expert. Nor does the State challenge the scientific validity and reliability of the Manual, upon which Wilson based his opinions. Rather, the State's point of contention centers on Wilson's interpretation of provisions of the Manual. For that reason, we conclude that no Daubert analysis was necessary. See, e.g., Perry Lumber Co. v. Durable Servs., 271 Neb. 303, 710 N.W.2d 854 (2006) (concluding that no Daubert analysis of methodology was necessary where party asserting error did not challenge scientific validity and reliability of methodology set forth in publication providing guidelines for scientific method of fire investigation). The State's arguments would more appropriately be characterized as an attack on the amount of weight that should be accorded to Wilson's opinions, rather than on the admissibility of such opinions. And determining the weight that should be given expert testimony is uniquely the province of the fact finder. Staley v. City of Omaha, 271 Neb. 543, 713 N.W.2d 457 (2006). We conclude that the district court did not abuse its discretion in admitting Wilson's or Daubert's testimony as expert testimony.

2. LIABILITY OF STATE
In order to recover in a negligence action brought under the State Tort Claims Act, a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and damages. Fickle v. State, 273 Neb. 990, 735 N.W.2d 754 (2007).

(a) Duty
The threshold issue in any negligence action is whether the defendant owes a legal duty to the plaintiff. Id. The question whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. Id. Concerning highways in general, the State has a duty to use reasonable and ordinary care in the construction, maintenance, and repair of its highways so that they will be reasonably safe for the traveler using them while exercising reasonable and ordinary care and prudence. Id. The State is not an insurer of the safety of travelers on its roads and highways. See Woollen v. State, 256 Neb. 865, 593 N.W.2d 729 (1999).
The State argues that the district court erred in failing to determine the appropriate standard of care because the court "failed to correctly apply the terms `Shall,' `Should,' and `May.'" Brief for appellant in case No. A-05-1226 at 39. It appears that the State's line of reasoning is that if it did not violate a mandatory provision of the Manual, it did not breach its duty of care.
The first issue we consider is whether the Manual provides the sole duty of care. The Nebraska Supreme Court has stated that the State's failure to comply with the Manual is evidence of negligence, *105 i.e., breach of duty. See Maresh v. State, 241 Neb. 496, 489 N.W.2d 298 (1992). Our state Supreme Court has also stated that advisory safety standards may represent a consensus of what a reasonable person in a particular industry would do, and therefore may be helpful to the trier of fact in deciding whether the standard of care has been met. Norman v. Ogallala Pub. Sch. Dist., 259 Neb. 184, 609 N.W.2d 338 (2000) (reasoning that failure to follow "should" recommendation contained in safety standards may be considered as evidence of negligence). We conclude that compliance with the mandatory provisions of the Manual is not all that is needed for the State to meet its duty and that the State is still bound to exercise ordinary care in selecting the appropriate traffic control device for the circumstances.

(b) Breach
In addressing whether the State was negligent, we must determine whether the measures taken by the State were adequate under the provisions of the Manual and whether the State breached its general duty of reasonable and ordinary care.

(i) Stop Ahead Sign
The State installed a stop ahead sign 1,500 feet from the intersection. Wilson testified that the sign was three times farther than it should have been. Daubert's testimony seemed to establish that the sign was appropriately placed, and Pline testified that the placement was "normal." In a bench trial of a law action, the court, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. Fickle v. State, 273 Neb. 990, 735 N.W.2d 754 (2007). However, the district court seemed to base its decision on the terms of the Manual, which we review independently of the district court's interpretation. See Tadros v. City of Omaha, 269 Neb. 528, 694 N.W.2d 180 (2005).
The district court determined that the State was negligent in failing to place the stop ahead sign within 500 feet of the intersection. The court stated that the Manual "sets a standard for placement of warning signs, such as the `stop ahead' sign in this case," that "[o]n a roadway with a 55 miles per hour speed limit, [the sign] should be 450 feet from the actual stop condition" and that "[i]n the instant case, the warning sign was more than ... 1000 feet farther away from the intersection than the [Manual] provides." However, the Manual only suggested that the sign be placed at least 450 feet away from the stop condition. It did not require or advise placement at 450 feet. Because the court's statements show that its finding was based on an incorrect belief that the Manual called for placement of the sign 450 feet in advance of the intersection, we conclude the court's factual finding was clearly erroneous.

(ii) Stop Line
The State did not use a stop line at the intersection. Section 3B-20 of the Manual, entitled "Pavement Word and Symbol Markings," provides: "The word `STOP' shall not be used on the pavement unless accompanied by a stop line ... and STOP sign...."
The expert testimony on this issue conflicted. Wilson pointed out that in the Manual's figure 2-2, the illustration of a wide-throat intersection showed a stop line, and the district court recognized the same in its judgment; but we note that four of the six illustrations comprised by figure 2-2  which is intended to show "[t]ypical locations for stop signs and yield signs"  depicted a stop line, and only one illustration included the word "STOP" on *106 the pavement. The court found the State negligent in failing to place a stop line at the intersection based on the above-quoted language of section 3B-20 of the Manual. Given that even Pline testified this issue was "subject to interpretation," we conclude the court's factual finding was not clearly erroneous.

(iii) Stop Signs
The State placed two stop signs at the intersection for the benefit of a northbound traveler on the south leg of Newberry Road. The court made no factual findings as to the sign on the left, which was intended to be a supplemental device. As to the sign on the right, the court found that the State breached its duty, stating in its judgment, "This placement does not comply with the [Manual] and the standard of placement of stop signs laterally from the edge of the highway at 12 feet."
Neither the State nor any of the appellees presented evidence of the right-hand sign's distance from the edge of Newberry Road. In looking at pictures of the sign, it does appear to be placed farther to the right than one would expect. However, the Manual does not require placement 12 feet from the edge of the road. Rather, the Manual provides that placement should not be closer than 12 feet from the edge. In its judgment, the court cites to an illustration of a wide-throat intersection contained in the Manual which shows a stop sign 12 feet from the edge of the road. But again, the illustration is of a "[t]ypical" location.
We are troubled by the court's dismissal of the evidence regarding the cone of vision. The court stated:
Much was made of the "cone of vision" as set out in [an exhibit containing diagrams and photographs of the intersection and a driver's field of view]. Such evidence was of some interest. However, nothing in regard to the "cone of vision" replaces the responsibility of the State ... to comply with the [Manual] in regard to the placement of signs. Further,... Pline testified that at higher speeds the focus of a driver is narrowed and extended farther and farther ahead. Therefore, the Court finds such evidence is not persuasive nor ultimately helpful to the Court as the trier of fact.
With respect to placement of a traffic control device, section 1A-2 of the Manual states in part:
Placement of the device should assure that it is within the cone of vision of the viewer so that it will command attention; that it is positioned with respect to the point, object, or situation to which it applies to aid in conveying the proper meaning; and that its location, combined with suitable legibility, is such that a driver traveling at normal speed has adequate time to make the proper response.
(Emphasis omitted.) (Emphasis supplied.)
An authoritative engineering textbook received in evidence at trial states, "The best vision occurs within a cone of 3°, clear vision within 10°, and satisfactory vision within 20°. Traffic signs and markings should fall within the cone of clear vision, since acuity for reading drops rapidly outside this limit." Wolfgang S. Homburger et al., Fundamentals of Traffic Engineering at 3-1 (15th ed. 2001). That textbook further provides, "Laterally, signs should be placed within the driver's cone of vision, but not so close that they constitute a hazard to an errant vehicle." Id. at 16-4. However, whether the stop sign on the right was in a driver's cone of vision was disputed  Wilson testified that it was not, and others, including Pline, testified that it was.
*107 Our interpretation of the Manual is that the stop sign needed to be placed within the driver's cone of vision, and not some specified distance from the edge of the road. To the extent the district court found that the Manual required placement from the edge of Newberry Road at 12 feet, such finding is clearly erroneous. We conclude, however, that the State breached its duty of ordinary care by placing the stop sign too far to the right of the road and outside of the cone of vision.

(iv) Rumble Strips
The State did not install rumble strips on the south leg of Newberry Road as shown on the DOR's signing plan. The strips were to be placed approximately 100 feet before the stop ahead sign. (The district court incorrectly stated that the rumble strips were to bracket the stop ahead sign.) The installation of rumble strips is not covered by the Manual, but the court found that the State breached its duty by failing to place the rumble strips as shown on its plan. We cannot say that this factual finding by the court was clearly erroneous.

(c) Causation
Above we concluded that the district court's findings that the State breached its duty in not placing a stop line at the intersection, in placing the right-hand stop sign too far to the right, and in not placing rumble strips before the stop ahead sign were not clearly wrong. We now consider whether the district court clearly erred in finding that the State's breach of duty was a proximate cause of each of the accidents.
The question of proximate cause, in the face of conflicting evidence, is ordinarily one for the trier of fact, and the court's determination will not be set aside unless clearly wrong. Staley v. City of Omaha, 271 Neb. 543, 713 N.W.2d 457 (2006). A proximate cause is a cause that produces a result in a natural and continuous sequence, and without which the result would not have occurred. Fickle v. State, 273 Neb. 990, 735 N.W.2d 754 (2007). To establish proximate cause, there are three basic requirements: (1) The negligence must be such that without it, the injury would not have occurred, commonly known as the "but for" rule; (2) the injury must be the natural and probable result of the negligence; and (3) there can be no efficient intervening cause. See Malolepszy v. State, 273 Neb. 313, 729 N.W.2d 669 (2007). An efficient intervening cause is new and independent conduct of a third person, which itself is a proximate cause of the injury in question and breaks the causal connection between the original conduct and the injury. Id. The causal connection is severed when (1) the negligent actions of a third party intervene, (2) the third party had full control of the situation, (3) the third party's negligence could not have been anticipated by the defendant, and (4) the third party's negligence directly resulted in injury to the plaintiff. Id.
The State argues that the respective negligence of Ostergard and Podoll proximately caused the accidents because those drivers did not obey the traffic control devices and did not maintain a proper lookout. Certainly, a motorist has the duty to look both to the right and to the left and to maintain a proper lookout for the motorist's safety and that of others. Id. And Neb.Rev.Stat. § 60-6,119(1) (Reissue 2004) requires a driver to obey any traffic control devices. However, § 60-6,119(2) provides, "No provision of the rules for which traffic control devices are required shall be enforced against an alleged violator if at the time and place of the alleged violation an official device is not in proper position and sufficiently legible to be seen by a reasonably observant *108 person." We note that neither Ostergard nor Podoll received traffic tickets as a result of the accidents for disobeying the stop signs. Several witnesses testified that the right-hand stop sign was too far away or was not readily visible. Wilson testified that the supplemental stop sign, located to the northbound drivers' left and in the median, was intended for a vehicle turning left and that the stop sign on the right was the "primary needed traffic control" for a "through motorist."
The State also argues that Ostergard's and Podoll's negligence was an efficient intervening cause. The State contends that the facts of the instant cases are indistinguishable from the facts of Zeller v. County of Howard, 227 Neb. 667, 419 N.W.2d 654 (1988), and Gerlach v. State, 9 Neb.App. 806, 623 N.W.2d 1 (2000). We disagree.
In Zeller, a truck was struck while driving at a low rate of speed through an intersection obstructed from view by a knoll. A stop sign at which the truck would have been obligated to stop had been knocked down, and the passenger of the truck sued the county for failing to replace the sign. The Nebraska Supreme Court held that the driver of the truck failed to take appropriate measures to avoid the collision and unreasonably disregarded the obvious danger of the intersection and that thus, the driver's conduct was an efficient intervening cause of the collision because his behavior was unforeseeable to the county.
In Gerlach, a case that was appealed to this court following the sustaining of the State's motion for summary judgment, we concluded that the State was not bound to anticipate that a driver would negligently attempt to navigate a left-hand turn across oncoming traffic without yielding or that said driver would fail to see an oncoming vehicle in time to avoid a collision. Thus, the driver's conduct was an efficient intervening cause.
In the instant cases, however, the intersection was not obstructed from view such that a driver would need to slow or stop before proceeding through the intersection. Unfortunately, the roadbed of Highway 30 was not visible from a distance due to its elevation's being lower than that of the approach of the south leg of Newberry Road, so drivers may not immediately have been aware where the roads intersected. The placement of the right-hand stop sign too far away from the road exacerbated the problem, and we cannot say that it was unforeseeable to the State that a reasonably attentive driver would fail to see it. We recognize that the State installed a supplemental stop sign in the island to the left and undertook other measures to warn of an upcoming stop condition. However, according to the expert testimony presented by Kirkwood Appellees and by Ostergard, a driver would look for, and reasonably expect to see, a stop sign a short distance from the right side of the road. The right-hand sign in this case was not appropriately located. We cannot say that the district court's factual findings on the issue of causation were clearly erroneous.
The dissent considers Robert Johnson's actions in its conclusion that the State's signage at the intersection was not the proximate cause of the Johnson-Podoll accident. The State alleged in its answer that Robert Johnson's damages were proximately caused by his negligence, which included failing to keep a proper lookout and failing to yield the right-of-way to Podoll. However, the State apparently abandoned this position at trial; the most significant evidence at trial concerning Robert Johnson's actions at the time of the accident came from the description of the accident contained in the motor vehicle *109 accident report and brief testimony admitted over the State's objection by a witness summarizing what Podoll had described. As a general rule, an appellate court disposes of a case on the theory presented in the district court. Wise v. Omaha Public Schools, 271 Neb. 635, 714 N.W.2d 19 (2006). Moreover, on appeal, the State does not assign or argue that the district court erred in failing to find that Robert Johnson was contributorily negligent. In the absence of plain error, an appellate court considers only claimed errors which are both assigned and discussed. In re Trust of Rosenberg, 273 Neb. 59, 727 N.W.2d 430 (2007). Because (1) any negligent conduct by Robert Johnson was not a theory of defense pursued by the State at trial, (2) the State does not assign error regarding the matter, and (3) we find no plain error, we decline to consider Robert Johnson's conduct on appeal.

3. SOVEREIGN IMMUNITY
The State assigns that the district court erred in failing to find that the State retained its sovereign immunity in placing the stop ahead sign and the "STOP AHEAD" pavement marking and in constructing a viaduct that was visible from the intersection. The State's argument on this issue is that it is immune from liability under § 81-8,219(11) because the visibility of Highway 30 was a condition that conformed to the State's plans for construction and because the stop ahead sign and pavement marking were installed as shown on properly approved plans and designs.
First, as to the placement of the stop ahead sign, above we concluded that the district court's factual finding was clearly erroneous and that the State did not breach its duty in installing this device. Second, the district court did not find that the State breached a duty with respect to the pavement marking; in fact, the court made no findings in regard to the pavement marking. Finally, the district court specifically found that the State had not waived its sovereign immunity in regard to the design of roadways, overpasses, or bridges, and the court stated that it did "not question in any way the design aspects of the intersection" or "the determination as to which traffic control devices were chosen for the intersection." It stated that each of those issues "clearly falls within the discretionary function exception to the tort claims act." This assignment of error lacks merit.

4. LOST EARNING CAPACITY
The State argues that the evidence was insufficient to establish that Kirkwood suffered a loss of earning capacity as a result of the accident. With regard to lost earning capacity, the district court stated that it accepted the deposition testimony of David W. Utley and Dr. Jerome Sherman, and the court entered judgment for loss of earning capacity in the amount of $442,219. The court stated that Kirkwood clearly "suffered significant injuries that resulted in his present emotional and cognitive difficulties" and that "[t]his has affected his ability to work."
The thrust of the State's argument on this issue is that Utley incorrectly assumed that all of Kirkwood's impairments were a result of the collision and that Sherman's opinions were based on Utley's opinion. Utley testified in his deposition, "It's my understanding that all of the... restrictions and all of the medical diagnoses that I'm aware of are as a result of the automobile collision." He based that conclusion "[o]n [his] review of the overall records and ... Kirkwood's report of what his work activities were prior to the ... motor vehicle accident." Utley did not believe that he had been provided any information as to a workplace accident sustained by Kirkwood in October or November *110 2003. In performing his analysis of Kirkwood, Utley did not make any attempt to distinguish restrictions that may have arisen from accident injuries from restrictions that may have arisen from some other cause or injury sustained at a different time.
The evidence shows that Kirkwood's family doctor released him to return to work without restrictions and that Kirkwood returned to work in January 2003. Kirkwood testified that his back had bothered him and that in November 2003, he "was doing some pretty strenuous work and it bothered [him] pretty bad again and put [him] out of work for a little while." More specifically, Kirkwood was twisting and bending in a narrow space as he removed an assembly of an alternator weighing approximately 200 pounds. Immediately after that incident, Kirkwood was off work for 2 months. He testified that he "opted to not do that job anymore and try to find something else just a little bit more suitable" and that "unfortunately, [in] North Platte, that's not easy to do." He testified that he voluntarily resigned from his railroad employment in October 2004, primarily due to problems associated with the back injury. He was unemployed at the time of trial. A psychiatrist testified that Kirkwood told him that Kirkwood returned to work following the accident and electively decided to leave in 2004 because he did not have much seniority with the railroad and "felt it just really wasn't ... worthwhile."
Dr. Estela Bogaert-Martinez testified:
Kirkwood is going to have a very difficult time regaining employment because of the damage to his motivational system, to his frontal lobes, which [are] the boss of the brain that allows him to continue to problem solve, to follow through, to engage in goal-oriented activity. So unless he gets a very structured, very repetitive type of job, anything that requires a lot of novel thinking and problem solving is going to be very hard for him.
In Utley's loss of earning capacity analysis, he stated that Kirkwood had a mild limitation for understanding and remembering detailed, complex, and multistep instructions; a moderate limitation for being able to maintain attention and concentration for extended periods of time; and a moderate limitation for working at a consistent pace without an unreasonable number or length of rest periods. Utley concluded that Kirkwood was employable but had sustained a loss of earning capacity of approximately 45 percent. Sherman testified the net economic loss for Kirkwood, discounted at 2.45 percent, would be $442,119.
Damages for permanent impairment of future earning capacity may not be based on speculation, probabilities, or uncertainty, but must be shown by competent evidence that such damages are reasonably certain as the proximate result of the pleaded injury. Anderson/Couvillon v. Nebraska Dept. of Soc. Servs., 253 Neb. 813, 572 N.W.2d 362 (1998). The determination of the amount of damages is a matter which is one solely for the fact finder, whose action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of damages proved. See Woollen v. State, 256 Neb. 865, 593 N.W.2d 729 (1999). The evidence demonstrates that Kirkwood returned to work following the accident, that he later injured his back while working, and that he resigned due in large part to the injury sustained at work. Even though Utley's analysis may have been flawed because he was of the impression that all of Kirkwood's restrictions and medical diagnoses were caused by the collision, Utley opined *111 that Kirkwood was employable. The court specifically stated that Kirkwood's emotional and cognitive difficulties  not any physical restrictions  would affect his ability to work. We conclude that competent evidence supported the district court's determination of damages based on Kirkwood's lost earning capacity.

5. MOTION TO COMPEL AND MOTION TO QUASH
In case No. A-05-1226, the State filed various pretrial motions relating to the experts of Kirkwood Appellees, and the State argues that the district court erred in overruling its motion to compel and its motion to quash.

(a) Motion to Compel
On February 22, 2005, the State filed a motion to compel. According to the motion, on June 3, 2004, the State served interrogatories and requests for production on Kirkwood Appellees, but the State had not been provided with answers or documents which could be deemed to constitute fully responsive answers to certain interrogatories and requests. The State sought responses to interrogatory No. 8 and request for production No. 1.
Interrogatory No. 8 requested information about each expert witness Kirkwood Appellees had consulted or intended to call at trial. Request for production No. 1 asked for medical records of any Kirkwood Appellees which related to their action against the State and the expenses which Kirkwood Appellees sought to recover.
On March 9, 2005, the court entered its order overruling the motion, stating:
The Court specifically notes that the treating physicians who are "experts" for the purposes of giving an instruction on expert witnesses are not experts retained in this case to testify on behalf of [Kirkwood Appellees], but were merely treating physicians. They are, therefore, fact witnesses who may be rendering opinions, but they were not retained to do so. See, Tzystuck v. Chicago Transit Authority, [124 Ill.2d 226, 529 N.E.2d 525, 124 Ill.Dec. 544 (1988)]; Ryder Truck Rental, Inc. v. Perez, [715 So.2d 289 (Fla.App.1998)]; and Schreiber v. [Estate of] Kiser, [22 Cal.4th 31, 91 Cal.Rptr.2d 293, 989 P.2d 720 (1999)].
The State argues that this was an abuse of discretion because the treating physicians were expert witnesses rather than fact witnesses, citing Smith v. Paiz, 84 P.3d 1272 (Wyo.2004) (status of treating physicians as fact or expert witnesses depends upon content of testimony).
The State asserts that Kirkwood Appellees offered medical opinion testimony from doctors Jennifer Burns, David Hurst, Mark Young, and Bogaert-Martinez at trial and that those doctors were not identified prior to trial in a responsive answer to interrogatory No. 8, but that they were listed on a document entitled "`Plaintiff's Designation of Expert Witnesses'" which was served on the State on December 8, 2004, identifying them as "`treating physician[s] who may be called to testify in this matter.'" Brief for appellant in case No. A-05-1226 at 44. The State argues that "[t]he `Plaintiff's Designation of Expert Witnesses' was not in the form of an Answer to Interrogatory, was not signed under oath, and did not state the substance of the facts and opinions to which the doctors were expected to testify." Id.
Certainly, a litigant has the right to have interrogatories answered and the adversary has a continuing duty to supplement prior responses. See Norquay v. Union Pacific Railroad, 225 Neb. 527, 407 N.W.2d 146 (1987). When a party has failed to respond, or respond properly, to an interrogatory authorized by Neb. Ct. R. of Discovery 26(b)(4)(A)(i) (rev. 2000), *112 or has failed to make supplemental responses required under rule 26(e)(1)(B), and such noncomplying party calls an expert witness to offer testimony within the scope of the interrogatory in question, the adverse party must object to a previously unidentified expert witness' testifying in general or object to testimony of an expert witness testifying about a previously undisclosed but discoverable matter sought to be disclosed by the interrogatory in question. Norquay v. Union Pacific Railroad, supra. If the court, over objection, allows such expert witness to testify, notwithstanding nondisclosure before trial, when appropriate the adverse party must move to strike the expert witness' testimony, request a continuance to give the surprised adversary an opportunity to investigate further and secure rebuttal evidence, or, under certain circumstances, move for a mistrial. Id.
At trial, the State objected to the offer of Burns' deposition, but the only reason for the objection was due to the State's cross-examination's being cut short because not enough time had been allotted. The State also objected to medical records from Burns, but only "to any use of them for opinions or diagnoses which are clearly excepted from the business records rule." During Hurst's testimony, he was asked for conclusions as to Kirkwood's condition, and the State objected "on basis of [rule] 702, opinions not previously disclosed and the basis of surprise." Counsel for Kirkwood Appellees responded, "We talked about it at the deposition." The court overruled the objection. During the testimony of Young and Bogaert-Martinez, the State objected to any "Rule 702 testimony" on the basis of surprise. However, the State never moved to strike the testimony or reports of the above doctors; nor did the State move for a continuance or for a mistrial. For those reasons, we reach the same conclusion as did the Nebraska Supreme Court in Norquay v. Union Pacific Railroad, 225 Neb. at 542, 407 N.W.2d at 156: "Whatever may have been an appropriate remedial measure ... at trial we do not decide in the absence of a motion for a particular remedial measure in the trial court."

(b) Motion to Quash
On May 31, 2005, the State filed a motion to quash Kirkwood Appellees' fifth supplemental answers to the State's first interrogatories and Kirkwood Appellees' seventh supplemental answers to the State's first requests for production of documents. The State argued that Kirkwood Appellees failed to seasonably supplement their answers and that their fifth supplemental answers to interrogatories failed to comply with the requirements of Neb. Ct. R. of Discovery 33 (rev. 2000). The State asserted that it was prejudiced by (1) the disclosure on the eve of trial of five new expert witnesses, namely Bonnie Edwards, Gutschenritter, Carman, Daubert, and Joel Cotton; (2) Kirkwood Appellees' attempt on the eve of trial to transform the witnesses previously identified as "treating physicians," namely Young, Bogaert-Martinez, Burns, Hurst, Gary Connell, Cotton, and Eric Hartman, into expert witnesses; and (3) the disclosure of witnesses Ken Barnum and Bill Heimbuch, whose identities had not been disclosed in any previous discovery proceeding.
On June 20, 2005, the court held a hearing on the motion. The State argued that the interrogatory answers were not signed under oath and that the interrogatory answers disclosed a number of expert witnesses in May  only a month in advance of trial. Counsel for the State represented that a pretrial order required expert witnesses to be disclosed by either December 31, 2004, or January 31, 2005. The State *113 contended that it was not afforded any reasonable opportunity to discover what the experts were going to say and to prepare a counterargument and that Kirkwood Appellees had been "trying to morph" the doctors they disclosed as treating physicians into expert witnesses "so they can get them to offer opinions on causation, damages, prognoses, diagnoses, things of that nature." The court responded, "The sort of things doctors always tell us. This can't be a surprise that the doctors are going to say what caused the injury and how much it's going to affect their [sic] life. I mean, that's what doctors do." Kirkwood Appellees argued that the State had known about the medical witnesses and had, for months, received reports from the witnesses setting forth their opinions. Kirkwood Appellees' counsel claimed that the State had the vast majority of the reports in late February, when the State moved to continue the trial so that dozens of depositions could be taken, but that the State had only taken one or two depositions since that time.
On June 22, 2005, the court overruled the motion in a writ-ten order. The State argues that this was an abuse of discretion because the court had previously ordered that all of Kirkwood Appellees' experts were to be disclosed by December 1, 2004, and Kirkwood Appellees knew the identities of most of the experts months before they were disclosed in response to the State's interrogatories.
We find no abuse of discretion by the district court for a number of reasons. First, we observe that Connell, Hartman, and Heimbuch did not provide any testimony at trial. Second, the State did not make any objections based on late disclosure to the testimony of Gutschenritter, Carman, or Barnum. Third, we already covered the State's objections at trial to testimony from Young, Bogaert-Martinez, Burns, Hurst, and Cotton on the basis of late disclosure, and noted that we could not provide relief when the State failed to move to strike, move for a continuance, or move for a mistrial. Fourth, the State objected to the offer of Cotton's deposition "on the lateness of the disclosure of the witness," but counsel for Kirkwood Appellees stated, "Just for the record ... Cotton is an expert retained by the [State] and who did an examination of [Robert] Johnson." Surely, the State was aware of Cotton's findings and opinions. Fifth, on the basis of surprise, the State objected during trial to a question asked of Edwards and to two exhibits she helped prepare, and the State also objected to the offer of Daubert's deposition "on the basis [that] the witness [Daubert] was not disclosed until about a month before trial as a potential expert." However, the State has failed to demonstrate any prejudice suffered as a result of the late disclosures. Although we do not condone the disclosing of experts after the deadline for such as imposed by the trial court, the control of discovery is generally a matter for judicial discretion. See Gallner v. Gallner, 257 Neb. 158, 595 N.W.2d 904 (1999). We find no abuse of discretion by the district court in denying the State's motion to quash.

VI. CONCLUSION
We conclude that the district court did not abdicate its gatekeeping function or abuse its discretion in admitting the expert testimony of Wilson and Daubert. We conclude that the court's factual findings that the State's negligence proximately caused the accidents were not clearly erroneous. The district court did not find that the State waived its sovereign immunity as alleged by the State. We conclude the evidence supports the award to Kirkwood based on lost earning capacity. Finally, we find no abuse of discretion by the court *114 in denying the State's motion to compel and motion to quash. We therefore affirm the judgments of the district court in each case.
AFFIRMED.
SIEVERS, Judge, dissenting.
I find that I must respectfully dissent from the affirmance of the judgments entered by the trial court in these two cases which have been consolidated for purposes of opinion and disposition. My colleagues' opinion comprehensively discusses the facts and circumstances of both accidents, with one exception to be discussed later, as well as the pertinent testimony and exhibits concerning the signage at the intersection of Newberry Road and Highway 30 located at the east corporate limits of North Platte, Nebraska. The written word cannot begin to accurately portray what was visible to the two northbound drivers, and the significance of such, as they approached the intersection. Nonetheless, let me begin by simply listing what the two northbound drivers passed by, and obviously ignored, as they blew through this protected intersection and collided with the Kirkwood and Johnson vehicles. All of such is power-fully depicted in the photographs of the signage at the intersection and its overall appearance. The northbound drivers would have seen the following had they been attentive:
 A diamond-shaped sign with a red octagon (for a stop sign) and a black arrow pointing forward, with a rectangular sign attached below saying "1500 FT."
 A large green-backgrounded sign with "JUNCTION" in white letters above a white diagram depicting an intersection of "4th STREET" on the left and the U.S. highway symbol with the number 30 in black numbers both to the right and straight ahead north.
 The words "STOP AHEAD" in the middle of the northbound lane in large letters, within 100 feet of the beginning of the island; on the northbound driver's left, a solid yellow no-passing line on the pavement and a black-on-white sign, placed on the south end of the island, depicting an island; on the driver's right, a white-on-green sign indicating North Platte to the left and Gothenburg to the right, with distances; and large overhead street lamps on both sides of the road.
 On the northbound driver's left, an oversized stop sign, with two reddish-orange flags on top of it, located at the center of the nose of the island for left turns.
 On the northbound driver's right at the edge of the "wide throat" right turn configuration, another stop sign identical to the sign described above.
In the simplest terms, if all of the above could speak to the northbound driver, they would scream, "MAJOR INTERSECTION AHEAD! CROSS TRAFFIC! STOP!"
Therefore, even if the State could be found negligent in its signage of the intersection, the failure of the trial court to find that the obvious negligence of the two northbound drivers was an efficient intervening cause is clearly wrong. As such, reversal of the trial court's judgments against the State is required.
In the majority opinion at section V(2), "LIABILITY OF STATE," under subheading (b), "Breach," the majority discusses the four specific aspects by which the trial court found the State was negligent with respect to signage at the intersection. These are (i) stop ahead sign, (ii) stop line, (iii) stop *115 signs, and (iv) rumble strips. My colleagues have concluded that the trial court's findings of negligence with respect to two of the four  (i) stop ahead sign and (iii) stop signs  are clearly erroneous, and I agree with my colleagues. That said, I disagree with what I see as a factual finding by the majority with respect to (iii) stop signs, when the majority opinion says, "We conclude, however, that the State breached its duty of ordinary care by placing the [right-side] stop sign too far to the right of the road and outside of the cone of vision." The difficulty with that finding by my colleagues is that it fails to recognize the fundamental fact that the concept of a driver's cone of vision is a dynamic rather than a static measurement of what a driver could see and where he or she would be when he or she could see the stop sign on the right. I note that there is no dispute that the stop sign on the northbound driver's left was appropriately within the driver's 10-degree cone of vision.
As pointed out in the majority opinion, the testimony is that an object within the central 10 degrees of the driver's vision is within the driver's "`clear vision'" and thus is readily visible to the driver. However, what is inside of, or outside of, that 10-degree cone of vision for a driver looking forward depends upon how far away from the object the driver is. In short, the 10-degree cone of vision takes in more objects the farther the driver is away from the objects. Consequently, as the driver approaches a stop sign, it will be within his 10-degree cone of vision at some point and then will pass outside of the 10-degree cone of vision as the driver gets closer and closer to it, to the point that it is more than 10 degrees outside, then directly beside him, and then behind him as he passes it. The farther the object is to the left or right of the driver's cone of vision, the farther back from the object the driver will be for the object to be in his cone of vision. And, all of this assumes a driver is staring directly ahead, without moving his vision left or right, because if he shifts his vision, then the objects to the left or right of straight-ahead vision obviously can fall within the 10-degree cone of vision. For example, when a driver directs his vision 15 degrees to the right, the 10-degree cone of clear vision obviously shifts 15 degrees to the right. In this case, an exhibit contains objective evidence through a series of photographs taken from a northbound vehicle as it approached the intersection  to depict what such a driver would see and where he would be on the roadway when objects such as the signs described above were in his 20-degree "satisfactory" cone of vision  again recognizing that even a slight shift to the left or right of the driver's vision has the effect of putting more objects within the cone of vision, and does so when the driver is closer to such objects. Superimposed on such photographs is a cone of vision as a shaded area, and through studying the exhibit, one can easily discern what exactly is in the cone of vision (of a driver staring straight ahead) and how far away from the intersection such an object is from the driver. The witness testifying about the exhibit acknowledged that drivers do not stare straight ahead but naturally shift their vision left and right of their driving path. And, in this respect, I would submit that reasonably attentive drivers do not drive with their vision fixed straight ahead. In other words, the attentive driver shifts vision to the left and right, which increases what he sees as well as affecting when such objects are seen as the driver proceeds forward on the roadway. The aforementioned exhibit reveals that all of the things listed at the outset, which tell the driver to stop, were readily visible to an attentive driver.
*116 Therefore, of the four grounds upon which the trial court found the State negligent, my colleagues find that two of those findings are clearly erroneous, and such fact obviously impacts the trial court's finding that the State's negligence was a proximate cause of the accident, as well as adversely impacting my colleagues' affirmance of that finding. Additionally, it is appropriate to point out at this juncture and emphasize that both stop signs were overly large stop signs, being 36 by 36 inches, with a cross dimension 20 percent larger than that of the typical 30-by 30-inch stop sign. And, both stop signs had two reddish-orange flags affixed to the top of them, obviously to call the motorists' attention to their presence.
With respect to the trial court's finding of negligence on the part of the State by failing to install rumble strips, my colleagues affirm such finding as not clearly erroneous, noting that the installation of such is not covered by the Manual but was in the State's original signing plan. When rumble strips are not required by the Manual, the fact that such were not installed by the State is an insufficient basis upon which to premise a finding of proximate cause and lack of intervening cause  given the other warnings listed above that the northbound motorist had to stop at this intersection.
The majority opinion discusses the fundamental principles of proximate cause and efficient intervening cause with the appropriate authority cited, which I will not repeat.
The Kirkwood-Ostergard collision occurred at night, when presumably the northbound Ostergard vehicle and the west-bound Kirkwood vehicle had their headlights illuminated. There is no evidence that Ostergard ever responded in any way to the numerous things which would tell a reasonably attentive driver that he was approaching a major intersection at which he was required to stop. His passenger, whose testimony provided the only source of evidence as to what Ostergard did or did not do, testified that Ostergard did not slow down, stop, or look left or right. Ostergard himself had no memory of anything that happened after leaving a truckstop some distance away from the accident site. There is simply no evidence that he was reasonably attentive or exercised even a touch of reasonable care. There was no physical evidence to indicate that Ostergard braked. In summary, Ostergard was a northbound driver with a duty imposed by law to be reasonably attentive who went through all of the signs and indications warning of a stop ahead at a major intersection. Even if two out of the four grounds of negligence on the part of the State are upheld, when analyzing proximate cause, it is impossible for me to conclude, given the numerous warning signs and devices obviously ignored by Ostergard in breach of his duty to exercise reasonable care and be reasonably attentive, that the accident and injury would not have occurred but for the State's negligence; nor can I say that the accident and injury was the natural and probable result of the State's negligence in signage. Even if the State was negligent in signing the intersection, I cannot say that Ostergard was not an efficient intervening cause.
An efficient intervening cause is the new and independent conduct of a third person which itself is a proximate cause of the injury in question and breaks the causal connection between any negligence on the part of the State in signing the intersection and Kirkwood's injuries. In the instance of an efficient intervening cause, the causal connection is severed when the negligent actions of a third party intervene, and Ostergard was obviously negligent; the third party had full control of *117 the situation, which Ostergard clearly did in that all he needed to do was see what was there to be seen and obey the traffic directions given by the traffic controls, signs, and devices; and the third party's negligence could not have been anticipated by the defendant, the State. With regard to the State's anticipation, the State was entitled to assume that Ostergard would act with reasonable care, and in my view, the State could not anticipate that a driver acting with reasonable care and attention would ignore the abundant signs of an approaching major intersection at which he had to stop before entering that intersection.
Finally, the fourth requirement with respect to efficient intervening cause is that the third party's negligence directly resulted in injury to the plaintiff. Obviously, it is the act of Ostergard in entering a protected intersection that directly caused the injuries to Kirkwood. Accordingly, in summary, even upholding two of the factual findings of negligence on the part of the State, such negligence was not a proximate cause of Kirkwood's injuries, and Ostergard's negligence was an efficient intervening cause even if the State's negligence was a proximate cause. For these reasons, I would reverse the verdict in the amount of $1,640,791.28 in favor of Kirkwood.
My colleagues have also affirmed the trial court's verdict in favor of Ostergard in the amount of $122,890.78, thereby affirming the trial court's finding that the State was 60-percent negligent and Ostergard was 40-percent negligent. The trial judge's apportionment of such percentages is based on its finding that "the duty of the State ... is greater than that of [Ostergard] in light of [its] overall obligation to protect all members of the traveling public by the way [it] conduct[s its] business." There is no citation of authority for the notion that the State has a greater duty to act with reasonable care toward members of the traveling public, i.e., Kirkwood, than does Ostergard. Even ignoring this unfounded conclusion of law imposing a greater duty on the State than upon Ostergard, under the facts of this accident as laid out above, a finding that Ostergard's negligence was less than the State's negligence is not supported by the evidence and is clearly wrong. The State's negligence is passive and Ostergard's negligence is active, and in my view, the State's negligence  even assuming it was a proximate cause, a conclusion that I cannot reach  still could not be found to be greater than Ostergard's by a reasonable fact finder. Accordingly, I would reverse the judgment, in Ostergard's favor.
Turning to the Johnson-Podoll collision, my problems with an affirmance of the trial court's verdict in the amount of $1,458,975.82 for Robert Johnson and $300,000 for his wife, Mavis Johnson, are even more pronounced than in the Kirkwood-Ostergard collision. I say this because my colleagues apparently do not find significance in the nature of this accident. In this accident, the northbound driver, Podoll, ignored all of the same warning signs and traffic control devices as did Ostergard, but it is of major import that the Johnson vehicle turned left in front of the Podoll vehicle in ignorance of Robert Johnson's duty to yield the right of way to an oncoming vehicle which was obviously not slowing down, let alone stopping. See Neb.Rev.Stat. § 60-6,147 (Reissue 2004) ("[t]he driver of a vehicle who intends to turn to the left within an intersection ... shall yield the right-of-way to any vehicle approaching from the opposite direction which is within the intersection or approaching so close as to constitute an immediate hazard").
Admittedly, Robert Johnson had a right to assume that the oncoming vehicle driven *118 by Podoll would obey the two over-sized stop signs which were facing Podoll and the backs of which would have been directly in front of Robert Johnson when he stopped for cross traffic on Highway 30. But, there is no evidence from Podoll that he slowed down, stopped, or braked; yet Robert Johnson blithely turned in front of a vehicle whose driver gave no apparent sign or indication of being aware of the fact that he was dutybound to stop. When I put the fact of Robert Johnson's left turn in front of the onrushing Podoll vehicle into the calculus of proximate cause and efficient intervening cause, I can only conclude that even if the State was negligent in its signing of the intersection, such was not a proximate cause, and that even if it could be considered a proximate cause, Podoll's negligence (and he can be no less negligent than Ostergard) combined with the negligence of Robert Johnson constitute efficient intervening causes. My colleagues advance three reasons why the fact that Robert Johnson turned left in front of the Podoll vehicle is not properly part of the analysis of the accident. I acknowledge that the State, while pleading such fact as a proximate cause and as an efficient intervening cause, did not actually advance such argument in the trial court. Nonetheless, that Robert Johnson turned left in front of Podoll is an undisputed fact about how the accident occurred, which, in my view, neither a trial court nor an appellate court can ignore merely because defense counsel may not have grasped its significance.
For these reasons, I would reverse all of the judgments entered in these two cases against the State and remand the matter to the trial court with directions to enter judgments in favor of the State and against each of the plaintiffs.