RAYMOND A. NORQUAY, APPELLANT, V. UNION PACIFIC RAILROAD
COMPANY, A CORPORATION, APPELLEE.

407 N.W.2d 146

Filed June 5, 1987.    No. 85-582.

Donald J. Loftus, P.C., for appellant.

Gayla L. Fletcher, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

Raymond A. Norquay appeals the verdict for Union Pacific Railroad Company in a personal injury action tried in the district court for Douglas County. We affirm.

### THEORIES OF THE PARTIES

Norquay sued Union Pacific for negligence based on the railroad's alleged last clear chance to avoid injury to Norquay

as he lay in intoxicated unconsciousness between the rails of Union Pacific's track.

Under Norquay's theory of liability, Union Pacific's two-unit diesel switch engine had come to an emergency stop without striking Norquay when the engine crew realized Norquay was between the rails, but, without ascertaining the location of Norquay, who was under the engine units after such emergency stop, the engineer moved the units forward over Norquay, striking him and causing bodily injury to Norquay. Thus, according to Norquay, as the result of the switch engine's complete stop and subsequent movement during which Norquay was struck, the doctrine of last clear chance would entitle a jury to find in Norquay's favor.

Among its defenses, Union Pacific asserted that Norquay assumed the risk or was contributorily negligent under the circumstances. Union Pacific contends its switch engine did not stop before striking Norquay because it was impossible to complete an emergency stop before hitting Norquay. Rather, the Union Pacific suggests that, after unavoidably striking Norquay, the switch engine's units passed over and beyond him, thereby rendering any second movement of the switch engine irrelevant in determining liability for Norquay's injuries, and exonerating the Union Pacific from liability.

Thus, on the issue of liability the crucial question involved the time and distance for an emergency stop of the Union Pacific's switch engine.

## THE ACCIDENT

In the early morning of June 9, 1982, Norquay, after an evening of heavy drinking and admittedly intoxicated, was crossing the Union Pacific tracks when he slipped and fell, striking his head on a rail and momentarily losing consciousness. When Norquay regained consciousness, over him there was a "big noise." When he tried to get up, Norquay discovered he was "underneath a train," which began to move and struck the back of Norquay's head, inflicting bodily injury and causing Norquay to lose consciousness again.

The "train" was a Union Pacific switch engine, consisting of two "GP-9" (general purpose) diesel units, which was traveling eastbound at 10 m.p.h. The first, or leading, unit was GP No.

209 and contained the engineer and assistant engineer. The second unit, GP No. 291, was coupled to unit 209. The area ahead was illuminated by the headlights of unit 209.

According to the engineer, while he was "[l]ooking out ahead," he saw the "shape of a body" between the rails, but the units never stopped until the engineer carried out an emergency stop of the units, which had completely passed over Norquay.

However, the assistant engineer related a slightly different account of the incident. When the front faceplate, or cowcatcher, of unit 209 was approximately "five or six feet" from Norquay, the assistant engineer realized there was a human body between the rails and immediately thereafter said, "I think that was a guy," at which time the engineer exclaimed, "Oh, sh—" and "hit the brakes" for an emergency stop accomplished within 25 feet. After the lapse of approximately 45 seconds, the engineer suggested, "Let's move the train ahead and see what we have got." The engineer moved the units forward and gradually stopped the switch engine. When the engineer and assistant engineer dismounted from the cab, they found Norquay between the rails, 50 feet behind unit 291.

## DISCOVERY AND PRETRIAL MATTERS

On April 17, 1984, Union Pacific served answers to Norquay's interrogatories, which included:

INTERROGATORY NO. 14: State the name and address of each person whom you expect to call as an expert witness at the trial of this lawsuit and with respect to each give the following information:

(a) The subject-matter on which each expert is expected to testify;

(b) The substance of the facts and opinions to which each said expert is expected to testify;

(c) A summary of the grounds for each opinion or factual conclusion with respect to which each said expert is expected to testify.

ANSWER: Unknown at this time.

A "Defendant's Witness List" was filed on January 17, 1985, informing Norquay that: "Defendant expects to call the following experts to testify at this trial: 1. Mr. P. Rhine, Doctor of Physics, to testify about breaking [sic] systems of GP 9's and

stopping distances." Shortly after filing its witness list, and apparently pursuant to court order, Union Pacific delivered to Norquay a "printout" concerning the "GP-9 Locomotive Emergency Stopping Distance," prepared by P.E. Rhine. That document indicated a complete emergency stop of GP units 209 and 291, traveling at 10 m.p.h., required 11 seconds and a distance of 119 feet. The Rhine document recited that the stopping distance was "calculated based upon assumptions of an initial speed of 10 mph, 1.33% descending grade and dry rail," and "[t]he stopping distance calculation included a set of computations for speed, brake cylinder pressure, milepost and distance travelled for each one second of elapsed time. . . . The calculated values . . . are based upon a number of characteristics of the GP-9 locomotive unit." Norquay did not depose Rhine.

After trial had been set for May 28, Norquay, on May 24, filed a "Motion in Limine" to preclude testimony from any expert for Union Pacific because the railroad had failed to respond to Norquay's interrogatory No. 14. At the hearing on Norquay's motion, the Union Pacific produced several documents as "data which was the basis for [a GP-9's] stopping distance estimate," which Norquay's attorney characterized as a "bushel basket full of equations and factual matter but no data for [a GP-9's] stopping distance estimate" and which the court described as a "pile of stuff on my desk."

Responding to the complaint about absence of an answer to Norquay's interrogatory No. 14, Union Pacific's counsel offered no explanation, but remarked: "Well, I think the appropriate thing for [Norquay's lawyer] to do is to have compelled the answers to the interrogatories."

In overruling Norquay's motion for preclusion of testimony from Union Pacific's expert witness, the court commented:

> It seems to me that if the names of the witnesses have been furnished since January and the bare bones of their testimony set forth in the witness list, that if an expansion was required, why, I think the burden was on [Norquay] to request it. That's the basis for my ruling.

## THE TRIAL, OR BATTLE OF EXPERTS

Trial commenced on May 28, and the Union Pacific called Paul Rhine, manager of train energy conservation for the

Union Pacific, as its expert witness concerning time and distance involved in emergency braking for a GP-9 locomotive. In the course of the trial, Norquay did not object to Union Pacific's calling Rhine as an expert witness. During Rhine's testimony, Norquay did object to Rhine's expressing an opinion about a GP-9's braking distance for an emergency stop, objecting that the question soliciting the opinion was an "[i]mproper question." After the court overruled Norquay's objection, Rhine explained that there are three steps in an emergency stop of a GP-9: first, the engineer's decision to stop (human reaction time); second, actuation of the brake lever, resulting in a buildup of air in the brake cylinder; and third, the stopping process, after a full braking force is developed. Based upon a GP-9's speed of 10 m.p.h., Rhine expressed his opinion that an emergency stop of a GP-9 consumed a minimum of 11 seconds and required a distance of 119 feet, plus 15 feet during the engineer's reaction time, or 134 feet for the total distance in an emergency stop. The length of the two units involved in the accident was 112 feet "coupler to coupler." (This means that the length of each unit was 56 feet.) The total time for the emergency stop, 11 seconds, included 8 seconds for sufficient air buildup in the brake cylinder to complete the emergency stop. Consequently, given 6 feet (distance between the unit's front faceplate and Norquay, when observed) and 112 feet (combined length of locomotive units), or a total of 118 feet, the 134 feet necessary for an emergency stop prevented a complete stop by the units to avoid striking Norquay and bolstered Union Pacific's theory that the switch engine never stopped while Norquay was beneath the units.

To respond to Rhine's opinion, Norquay called Ted T. Sokol, a professor of engineering and technology, who gave his opinion disputing the figures for Rhine's conclusion about the emergency stopping distance of a GP-9. According to Sokol, Rhine had used a figure of 8 seconds as the maximum time for air pressure buildup in a GP-9's brake cylinder during an emergency stop, whereas only 4 seconds were required in such buildup in an emergency stop. The emergency stopping distance for GP-9 units, in Sokol's opinion, was between 48 and 60 feet. (Sokol's computation, therefore, placed Norquay

under the GP-9 units at completion of the emergency stop.) On cross-examination, and referring to the buildup of air pressure in a GP-9 brake cylinder, Union Pacific's counsel inquired, "You didn't do anything to verify that four seconds, did you?" and "you didn't do anything to test a GP 9?" to which Sokol answered, "No." Shortly after Sokol concluded his testimony, trial was adjourned for the day.

The next morning, Union Pacific recalled Rhine. Referring to the time for buildup of air pressure in a GP-9 brake cylinder, especially the contrast of 8 seconds (Rhine's testimony) versus 4 seconds (Sokol's testimony), Union Pacific's attorney asked: "How did you derive the eight seconds?" Without objection, Rhine responded:

> I went down to the Union Pacific shops where we maintain and store the locomotive. I got a locomotive mechanic and went out to some GP 9's and went through the brake emergency. I timed with a stop watch the length of time for the pressure to reach its full amount in the brake cylinder.
>
> . . . .
>
> . . . Eight seconds.

In further questioning by Union Pacific's attorney, Rhine acknowledged that he had "run that test on more than one occasion," and, on each occasion, the test results were "the same" or "consistent."

After Rhine had testified about the results of his tests involving the "charging time" in the buildup of air pressure for an emergency stop of a GP-9, Norquay did not move to strike Rhine's testimony concerning the tests or request a continuance. Rather, during cross-examination of Rhine, Norquay's counsel prefaced part of the interrogation with "you testified on direct examination that something that we didn't know during your first testimony . . . was . . . figures that you used . . . from an actual on-site investigation where you observed an engine . . . ." Counsel then continued cross-examination of Rhine and inquired about the airbrake test performed on a GP-9. When interrogation of Rhine was concluded, Norquay immediately recalled Sokol as a witness. Sokol testified about recomputation of the stopping distance of

a GP-9, incorporating the "eight seconds of cylinder pressure build-up time" utilized by Rhine in his calculations. According to Sokol, even with the 8-second interval used by Rhine, "after the brake handle was put into the emergency position, the train would have traveled 53.2 feet until it came to a stop."

## CONDUCT OF JUROR AND VERDICT

While en route to the jury room during a recess, the jury passed by a one-way glass partition, that is, the jurors were able to see Norquay on the other side of the partition, but Norquay was unable to see the jurors. One juror thumbed his nose at Norquay, but only one other juror observed the gesture directed at Norquay. The jury later returned an 11 to 1 verdict for the Union Pacific. When Norquay discovered the nose-thumbing incident, such conduct was alleged as a ground for a new trial. In a posttrial hearing, court and counsel interrogated the juror who had observed the gesture toward Norquay. That juror testified that the conduct and gesture by the other juror in no way affected the "vote" of the observant juror who, in fact, had not signed the verdict but had "voted for the plaintiff."

## ASSIGNMENTS OF ERROR

For assignments of error, Norquay argues the trial court erred (1) in allowing the jury to consider the testimony of Rhine, who, as an expert witness, testified about airbrake "tests" as facts or bases for his opinion, when Union Pacific, in answering Norquay's interrogatories, had failed to disclose such facts; (2) in failing to grant a new trial on account of "prejudicial surprise," namely, disclosure during trial that Rhine utilized "tests" as a basis or support for his opinion; and (3) in failing to grant a new trial in view of juror misconduct, the nose-thumbing incident.

## NEBRASKA DISCOVERY RULES

The parts of the Nebraska Court Rules of Discovery applicable in this case are:

## [RULE 26]

Rule 26. General Provisions Governing Discovery.

. . . .

(b) Scope of Discovery. Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

. . . .
(4) Trial Preparation: . . . .

(A) (i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

. . . .
(e) Supplementation of Responses. A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his or her response to include information thereafter acquired, except as follows:

(1) A party is under a duty seasonably to supplement his or her response with respect to any question directly addressed to

. . . .
(B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which he or she is expected to testify, and the substance of his or her testimony.

### [RULE 33]

Rule 33. Interrogatories to Parties.

(a) Availability; Procedures for Use. . . .

Each interrogatory shall be repeated and answered separately and fully in writing under oath . . . . The party submitting the interrogatories may move for an order under Rule 37 (a) with respect to any objection to or other failure to answer an interrogatory.

### [RULE 37]

Rule 37. Failure to Make Discovery: Sanctions.

. . . .
(d) Failure of Party to Attend at Own Deposition or Serve Answers to Interrogatories or Respond to Request for Inspection. If a party . . . fails

. . . .

(2) To serve answers or objections to interrogatories submitted under Rule 33, after proper service of the interrogatories, . . .

(3) . . . the court in which the action is pending on motion may make such orders in regard to the failure as are just, and among others it may take any action authorized under paragraphs (A), (B), and (C) of subdivision (b) (2) of this rule.

. . . .

The failure to act described in this subdivision may not be excused on the ground that the discovery sought is objectionable unless the party failing to act has applied for a protective order as provided by Rule 26 (c).

A sanction authorized by Neb. Ct. R. of Disc. 37(b)(2)(B) (rev. 1983) is: "An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him or her from introducing designated matters in evidence."

Quite obviously, resolution of the entire issue of liability in the present case turned on the testimony and opinions from expert witnesses.

With some modification irrelevant to the questions presently before us, the Nebraska Court Rules of Discovery for Civil Cases are the same as the rules for discovery prescribed in the Federal Rules of Civil Procedure.

## OBJECTIVES OF DISCOVERY PROCESS

A purpose of the discovery process is exploration of all available and properly discoverable information to narrow the fact issues in controversy so that a trial may be an efficient and economical resolution of a dispute. See *Tabatchnick v. G. D. Searle & Company*, 67 F.R.D. 49 (D.N.J. 1975). Also, the discovery process provides adequate pretrial preparation as a basis for an informed cross-examiner and informative cross-examination. Further, the discovery process enables litigants to prepare for a trial without the element of an opponent's tactical surprise, a circumstance which might lead to a result based more on counsel's legal maneuvering than on the merits of the case. See *Gebhard v. Niedzwiecki*, 265 Minn. 471, 122 N.W.2d 110 (1963).

As a result of Neb. Ct. R. of Disc. 26(b)(4)(A)(i) (rev. 1983), the liberal discovery of potential testimony of an expert witness is not merely for convenience of the court and litigants, but exists to make the task of the trier of fact more manageable by means of an orderly presentation of complex issues of fact. See *Weiss v. Chrysler Motors Corporation*, 515 F.2d 449 (2d Cir. 1975).

Neb. Ct. R. of Disc. 33 (rev. 1983), authorizing appropriate written interrogatories, is one of the means to accomplish the general goals of the discovery process designed to facilitate trial. "As is true of the other discovery rules, Rule 33 is intended to enable a party to prepare for trial, to narrow the issues and thus help determine what evidence will be needed at the trial, and to reduce the possibility of surprise at the trial." 8 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2162 at 484-85 (1970).

Therefore, as authorized by Rule 26(b)(4)(A)(i), Norquay's interrogatory No. 14 sought information concerning the identity of any expert whom the Union Pacific expected to call at trial; the subject matter of the expert's opinion; the substance of the *facts* and opinions in the expected testimony from the expert witness; and a summary of the *grounds* for the expert's opinion. Without question, any test performed by Rhine regarding air buildup in a GP-9 brake cylinder to effect an emergency stop was a fact disclosed to the jury during Rhine's testimony offered by the Union Pacific and a factual basis or support for Rhine's opinion that the Union Pacific's units could not have been stopped before injury to Norquay. The information sought by Norquay's interrogatory No. 14 was, therefore, proper matter for discovery.

## CONTINUING DUTY TO SUPPLEMENT ANSWERS TO INTERROGATORIES

Under Rule 26(e)(1)(B), there is an explicit duty seasonably to supplement a response to a request for discovery (here, a response to an interrogatory) directed toward identity of an expert witness expected to be called at trial, the subject matter of expected testimony from such expert, and the substance of the expert witness' expected testimony. As a consequence of Rule 26(e) and within the purview of that rule, a litigant has the

right to have interrogatories answered and the duty to supplement answers previously given in response to an adversary's interrogatories, which is a continuing duty to supplement prior responses. See, *Weiss v. Chrysler Motors Corporation, supra; Price v. Lake Sales Supply R. M., Inc.,* 510 F.2d 388 (10th Cir. 1974); *Voegeli v. Lewis,* 568 F.2d 89 (8th Cir. 1977). As expressed in 8 C. Wright & A. Miller, *supra* at § 2048 at 320-21:

> For a party to sit idly by, knowing that a previous answer he has given in response to discovery is no longer truthful in the light of his present information, is intolerable. It is inconsistent with the purpose of the rules to avoid surprise and it is inconsistent with the standards of conduct that one expects in a learned and honorable profession.

In reference to expected testimony from an expert,

> [I]f a party changes his plans about the expert witnesses he will use at trial or if there is a change in the subject matter on which an expert will testify or the substance of his testimony a supplemental response must be made. This is necessary to carry out the provisions of Rule 26(b) (4) with regard to expert witnesses. With the expert witnesses, as with the persons having knowledge of discoverable facts, any change in plan would routinely come to the attention of the lawyers for the party and the burden of supplementation is very small.

8 C. Wright & A. Miller, *supra* § 2049 at 322-23. The existence of the airbrake tests by Rhine and results from those tests were facts which the Union Pacific did not disclose until adduction of testimony during trial and which went to the substance of Rhine's opinion testimony.

The continuing duty to supplement responses quickly dispatches the ill-advised suggestion by Union Pacific that "the appropriate thing for [Norquay's lawyer] to do is to have compelled the answers to the interrogatories."

### SANCTION UNDER RULE 37

Under the obligation imposed by Rule 26(e)(1)(B), Union Pacific was under a continuing duty to supplement its answers to Norquay's interrogatory No. 14 regarding an expert witness. That the Union Pacific before trial knew about existence of the

airbrake tests by Rhine is reasonably inferable from, if not compelled by, counsel's cross-examination of Sokol, Norquay's expert witness, before recalling Rhine to testify further about the airbrake test, namely: "You didn't do anything to verify that four seconds, did you?" and "you didn't do anything to test a GP 9?" By such questions and beyond question, counsel was alluding to the tests performed to substantiate Rhine's opinion about the maximum time to build up cylinder air pressure for an emergency stop of the locomotive units. Therefore, we find that Union Pacific failed to satisfy its duty to supplement its previous responses to Norquay's interrogatory concerning an expert witness and such witness' expected testimony to be given at trial.

Sanctions under Rule 37 exist not only to punish those whose conduct warrants a sanction but to deter those, whether a litigant or counsel, who might be inclined or tempted to frustrate the discovery process by their ignorance, neglect, indifference, arrogance, or, much worse, sharp practice adversely affecting a fair determination of a litigant's rights or liabilities. See *National Hockey League v. Met. Hockey Club*, 427 U.S. 639, 96 S. Ct. 2778, 49 L. Ed. 2d 747 (1976). Sanctions under Rule 37 are designed to prevent a party who has failed to comply with discovery from profiting by such party's misconduct. *Dellums v. Powell*, 566 F.2d 231 (D.C. Cir. 1977); *Gebhard v. Niedzwiecki*, 265 Minn. 471, 122 N.W.2d 110 (1963).

An appropriate sanction under Rule 37 is determined in the factual context of a particular case and is initially left to the sound discretion of the trial court, whose ruling on a request for sanction or a sanction imposed will be upheld in the absence of an abuse of discretion. See, *Easley v. Anheuser-Busch, Inc.*, 758 F.2d 251 (8th Cir. 1985); *Guidry v. Continental Oil Co.*, 640 F.2d 523 (5th Cir. 1981); *Fox v. Studebaker-Worthington, Inc.*, 516 F.2d 989 (8th Cir. 1975).

To avoid sanctions under Rule 37(d), an interrogated party must either answer or object to the interrogatories or move for a protective order relieving the interrogated party from answering the interrogatories. Rule 37(d)(2) and (3). See, *Dellums v. Powell, supra; Monogram Models, Inc. v. Industro*

*Motive Corporation*, 492 F.2d 1281 (6th Cir. 1974); *Szilvassy v. United States*, 82 F.R.D. 752 (S.D.N.Y. 1979).

As a sanction for noncompliance with Rule 26(b)(4)(A)(i) and the duty to supplement required by Rule 26(e)(1)(B), preclusion of an expert witness' testimony, insofar as such testimony concerns an opinion or facts known in the witness' capacity as an expert, may be an appropriate sanction under Rule 37(d). See, *Easley v. Anheuser-Busch, Inc., supra; Murphy v. Magnolia Elec. Power Ass'n*, 639 F.2d 232 (5th Cir. 1981); *E. E. O. C. v. Kenosha Unified Sch. Dist. No. 1*, 620 F.2d 1220 (7th Cir. 1980). In a hierarchy of harshness in permissible sanctions under Rule 37, ranging from the least to the most harsh, preclusion of evidence lies somewhere between the reimbursement to an opposing party for expenses incurred as the result of noncompliance for discovery and dismissal or default judgment. See *Cine Forty-Second St. Theatre v. Allied Artists*, 602 F.2d 1062 (2d Cir. 1979). In determining whether to exclude testimony of an expert witness called by a party who has failed to comply with a request for discovery, the trial court should consider the explanation, if any, for the party's failure to respond, or respond properly, to a request for discovery concerning an expert witness; importance of the expert witness' testimony; surprise to the party seeking preclusion of the expert's testimony; needed time to prepare to meet the testimony from the expert; and the possibility of a continuance. See *Murphy v. Magnolia Elec. Power Ass'n, supra*. See, also, *Meyers v. Pennypack Woods Home Ownership Assn.*, 559 F.2d 894 (3d Cir. 1977).

For preclusion of testimony as a sanction for noncompliance with Rule 26(b)(4)(A)(i) (interrogatories) and Rule 26(e)(1)(B) (supplemental responses), Rule 37(d) does not require noncompliance with a prior order for discovery. As previously pointed out in this opinion, Rule 37(d) places on the interrogated party the burden to answer interrogatories, object, or seek a protective order under Rule 26(c) of the Nebraska Court Rules of Discovery. See *Easley v. Anheuser-Busch, Inc., supra* (2 days before trial, defendant served supplemental answers to interrogatories concerning defendant's expert witnesses; at trial, plaintiff objected to "expert opinion

testimony" from the witnesses in question; objection sustained; ruling on preclusion affirmed). See, also, *Murphy v. Magnolia Elec. Power Ass'n, supra* (objection to expert witness' testimony at trial; procedure correct, but abuse of discretion found on appeal); *Holiday Inns, Inc. v. Robertshaw Controls Co.*, 560 F.2d 856 (7th Cir. 1977) (failure to supplement interrogatories concerning expert's alternative theory; preclusion after objection at trial); *Barnes v. St. Francis Hospital & School of Nursing*, 211 Kan. 315, 507 P.2d 288 (1973) (failure to supplement discovery regarding a physician's opinion based on pathological slides undisclosed before trial; on objection at trial, preclusion of physician's testimony was proper). A prior order to answer or supplement interrogatories is unnecessary for sanction under Rule 37(d), since it is a party's responsibility, not the court's, to satisfy conditions and burdens for admission of evidence bearing upon that party's claim or defense. Sanction for failure in the continuing duty to make supplemental responses, without a prior order to compel discovery, avoids frustration of Rule 33(a) of the Nebraska Court Rules of Discovery ("Unless otherwise permitted by the court for good cause shown no party shall serve upon any other party more than fifty interrogatories") and avoids judicial involvement in the day-to-day discovery process. Also, if a prior order for discovery were necessary before a sanction could be imposed under Rule 37(d) for noncompliance with Rule 26(b)(4)(A)(1) (interrogatories) and Rule 26(e)(1)(B) (supplementation of responses), a party failing to fulfill the continuing duty to answer an interrogatory would be able to take advantage of and benefit from the misconduct in such noncompliance. Discovery must not degenerate into a game of evasion. See *Voegeli v. Lewis*, 568 F.2d 89 (8th Cir. 1977).

## PROCEDURE FOR PRECLUSION OF TESTIMONY AS A SANCTION UNDER RULE 37(d)

When a party has failed to respond, or respond properly, to an interrogatory authorized by Rule 26(b)(4)(A)(1), or has failed to make supplemental responses required under Rule 26(e)(1)(B) of the Nebraska Court Rules of Discovery, and such noncomplying party calls an expert witness to offer testimony within the scope of the interrogatory in question, the adverse

party must object to a previously unidentified expert witness' testifying in general or object to testimony of an expert witness testifying about a previously undisclosed but discoverable matter sought to be disclosed by the interrogatory in question. If the court, over objection, allows such expert witness to testify, notwithstanding nondisclosure before trial, when appropriate the adverse party must move to strike the expert witness' testimony, request a continuance to give the surprised adversary an opportunity to investigate further and secure rebuttal evidence, or, under certain circumstances, move for a mistrial. See, *Sather v. Lindahl*, 43 Wash. 2d 463, 261 P.2d 682 (1953); *Hoey v. Hawkins*, 332 A.2d 403 (Del. 1975); *Seaboard Air Line Railroad Company v. Cain*, 175 So. 2d 561 (Fla. App. 1965).

Although Norquay's pretrial motion was sufficient to raise preclusion of testimony as a permissible sanction under Rule 37(d), Norquay did not move to strike Rhine's testimony about the tests on the airbrake system for a GP-9. As we stated in *State v. Archbold*, 217 Neb. 345, 352, 350 N.W.2d 500, 505 (1984): "Failure to make a timely objection or motion to strike will ordinarily bar a party from later claiming error in the admission of testimony." Norquay's failure to make a motion to strike Rhine's testimony precludes our reviewing any question concerning submission of such evidence for the jury's consideration. Also, Norquay did not move for a continuance, in view of Rhine's testimony, or seek a mistrial. Whatever may have been an appropriate remedial measure for Norquay at trial we do not decide in the absence of a motion for a particular remedial measure in the trial court. In *Holden v. Urban*, 224 Neb. 472, 474, 398 N.W.2d 699, 701 (1987), we stated:

> In the absence of plain error, where an issue is raised for the first time in the Supreme Court, such issue will be disregarded inasmuch as the court whose judgment is being reviewed cannot commit error regarding an issue never presented and submitted for disposition. *Haeffner v. State*, 220 Neb. 560, 371 N.W.2d 658 (1985).

The district court committed no error in disposing of questions pertaining to Rhine's testimony.

## JUROR MISCONDUCT

Norquay's contention that a new trial should be granted on

account of juror misconduct is without merit. As a ground for setting aside a verdict in view of alleged misconduct by a juror, one must show that the questioned conduct entered into a verdict prejudicial or adverse to the party alleging such misconduct. See, *Zancanella v. Omaha & C.B. Street R. Co.*, 96 Neb. 596, 148 N.W. 158 (1914); *State v. Woodward*, 210 Neb. 740, 316 N.W.2d 759 (1982).

As we noted in *Ellis v. Far-Mar-Co*, 215 Neb. 736, 743-44, 340 N.W.2d 423, 427 (1983):

> Proof of mere indiscretion in the conduct of a juror is not suffucient [sic] to avoid a verdict unless the proof establishes that his conduct was of such character that prejudice may be presumed. [Citations omitted.]
>
> . . . .
>
> When a new trial is sought for juror misconduct, the finding of the trial court will not be set aside unless the evidence of misconduct is clear and convincing. [Citation omitted.]

Although we do not condone the juror's activity in question, Norquay has failed to demonstrate that the juror's conduct resulted in prejudice to Norquay. The district court properly denied Norquay a new trial on the ground of juror misconduct.

AFFIRMED.