IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


VELAZQUEZ V. VELAZQUEZ


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


KRISTEN R. VELAZQUEZ, APPELLEE,
V.
HUGO E. VELAZQUEZ, APPELLANT.


Filed August 24, 2021.    No. A-20-745.


Appeal from the District Court for Douglas County: J RUSSELL DERR, Judge. Affirmed.

Kory L. Quandt and Ryan M. Hoffman, of Bressman, Hoffman & Jacobs, P.C., L.L.O., for appellant.

Jerome J. Ortman for appellee.


PIRTLE, Chief Judge, and MOORE and WELCH, Judges.

MOORE, Judge.

### INTRODUCTION

Hugo E. Velazquez appeals from the order of the district court for Douglas County, which dissolved his marriage to Kristen R. Velazquez. He assigns error to the court's denial of his request to have the parties' children testify in camera and to the court's award of sole custody of the children to Kristen. Finding no abuse of discretion, we affirm.

### STATEMENT OF FACTS

The parties were married in January 2006. They have two children together, a son born in June 2006 and a daughter born in June 2008. The parties separated and initiated divorce proceedings in 2015, but for reasons not clear in the present record, that dissolution action was never finalized. The record shows that the parties operated under a "50/50" parenting time arrangement until Hugo and his girlfriend moved to Maine in October 2018 and left the children with Kristen. At trial in the present divorce proceedings, Hugo testified that prior to his departure

- 1 -

for Maine, Kristen had parenting time on Mondays and Tuesdays; he had parenting time Wednesdays and Thursdays; and the weekend parenting time was from Friday after school until the children were returned to school on Monday morning. He did not clarify whether this weekend parenting time rotated between the parties.

Kristen filed the present complaint for dissolution of marriage in October 2018. At that time, Hugo did not live in Nebraska (he returned to Nebraska in March 2019). Hugo answered and filed a counterclaim for dissolution. Both parties sought dissolution of the marriage and an equitable division of the marital estate, sought sole custody of the parties' children, and asked the court to determine child support and parenting time. Hugo appeared pro se throughout the district court proceedings, but he is represented by an attorney on appeal.

Kristen filed a motion for temporary custody and child support, and on February 28, 2019, the district court entered an order granting her temporary sole custody of the parties' children. The court ordered Hugo to pay temporary child support of $784 per month, retroactive to December 1, 2018. The temporary child support award was based on Hugo's total monthly income of $3,333 and Kristen's total monthly income of $2,666. The court granted Hugo temporary parenting time on alternating weekends from 5 p.m. Friday until 5 p.m. Sunday, one evening per week from 5 p.m. until 8 p.m., and holiday parenting time as set forth in *Wilson v. Wilson*, 224 Neb. 589, 399 N.W.2d 802 (1987), *disapproved on other grounds, State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019).

During a March 2019 hearing on a motion to compel discovery responses filed by Kristin, Hugo provided her attorney with answers to interrogatories. One interrogatory asked Hugo to provide the names of "[p]ersons with knowledge of issues involved in pending action." In response, Hugo only listed the name of his girlfriend. The bill of exceptions for the hearing shows that Hugo submitted two pages of interrogatory answers. He also appears to have given Kristen's attorney copies of some income tax returns at the hearing. He did not submit any other documents that might have been requested in discovery (the actual interrogatories and request for production of documents referenced during the hearing do not appear in our record, nor does the motion to compel). Discussion at the conclusion of the hearing indicates that the district court was sustaining the motion to compel but that the court was giving Hugo a week to answer further. The court asked Kristen's attorney to "submit an order to that effect." Our record does not contain any written order ruling on the motion to compel or any evidence that Hugo submitted supplemental discovery responses.

On July 29, 2019, Hugo filed a witness and exhibit list with the district court, in which he listed his girlfriend and the parties' children as "the people I want to call as witnesses in my case to tell the judge what they know about my case." Next to each of the children's names on this list is a handwritten notation of "IN CAMERA INTERVIEW." This witness and exhibit list included a certificate of mailing section, stating that Hugo had mailed a copy to Kristen's attorney on July 29. The record on appeal does not indicate what prompted Hugo's filing at that particular time (discussion between the court and Kristen's attorney at a show cause hearing held in August indicates that a trial date had not been scheduled at that point).

On February 6, 2020, the district court entered an order, scheduling trial for March 20. This is the only scheduling order contained in the record on appeal. The February 2020 order notified the parties that all witnesses and actual trial exhibits should be identified in writing not less than

10 days before trial and that failure to comply with the requirements of the order might result in the exclusion of evidence or other sanctions. We note that the March 2020 trial date was rescheduled due to the COVID-19 pandemic.

Trial was held before the district court on August 18, 2020. The court heard testimony from the parties, Hugo's girlfriend, and Kristin's boyfriend, and it received various exhibits. The court denied a request by Hugo to hear in camera testimony from the parties' daughter, who was present outside the courtroom.

The parties presented evidence about their multiple residences during the marriage and since their final separation. The parties resided in California at the time of their marriage. They lived at three different addresses in California before moving to Colorado after a few years. They spent 5 years in Colorado, living at four different addresses, before returning to California (one address). At some point, Kristen had cancer surgery; she remained in California for about 6 months before moving (with the children) to live with her father in Kennard, Nebraska. Hugo did not move with them at that time. At some point she moved into her own residence in Omaha and placed the parties' son in school. He was in second grade at the time; he had attended five previous schools during the course of kindergarten, first grade, and a portion of his second grade year. At some point, Hugo moved to Nebraska, and the parties "got back together again briefly," moving to another address in Omaha where they lived together before separating again. Kristen then moved to her present address where she had lived for 5 years at the time of trial and Hugo moving to an address in Council Bluffs, Iowa. Kristen compiled an exhibit listing the parties' various addresses since their marriage. Her exhibit lists eight addresses for Hugo after his move to Council Bluffs, including his residence in Maine. According to Hugo, he has only lived in four of those addresses. Hugo testified that he had been living at his current address in Omaha since January 2020. Hugo's girlfriend's testimony was consistent with Hugo's testimony, although she acknowledged that one of the addresses on the list belongs to her father and that she and Hugo had stayed there twice after their return from Maine.

The parties both testified about Hugo's reason for moving to Maine. According to Kristen, Hugo "was going to go find his happiness and put himself first for once." She also indicated that he wanted to live near his brother and other family. Hugo testified that he and his girlfriend moved to Maine because he got injured, he was unable to work, and his brother was going to help them financially while he recovered. He stated that he told Kristen he moved to Maine because he "wanted to be around [his] family, the children wanted to be around [his] family, and [he and his girlfriend] wanted to live in a beautiful place." He indicated that he and his girlfriend returned to Nebraska because the plan, which according to Hugo had been for him to have parenting time during the children's winter, spring, and summer breaks, "didn't work out." Kristen's testimony, however, indicates that Hugo rejected a plan drafted by her that called for her to have the children during the school year and for him to have them during the Christmas and summer breaks.

There was evidence about the parties' employment. Hugo testified that he had a "good job" as "a journeyman carpenter" when the parties first lived in California. According to Kristen, Hugo "install[ed] cable" when the parties lived in Colorado. He also indicated that he was on unemployment for 10 months during this period when "the economy crashed in 2008." Hugo did not work while he was in Maine. He obtained employment at Clear Choice Bath in April or May 2019 after returning to Nebraska from Maine, and he began paying child support in June. He

testified that "[i]t took [him] about a month and a half to be able to get money sent" after starting this employment. Hugo also does some part-time work as a photographer, which Hugo described as "a hobby." His federal income tax returns reflect taxable income from "[p]ensions and annuities" of $23,823 in 2016 and "[w]ages, salaries, tips, etc." of $40,820 in 2017 and $2,383 in 2018.

Kristen has worked as a hair stylist since living in Nebraska. Kristen's federal income tax returns reflect "[w]ages, salaries, tips, etc." of $31,379 for 2017, $39,798 for 2018, and $43,272 for 2019. She indicated that her income had "gone down some because of the virus," and she testified that she was making "close to 40,000 a year, a little under last year, a little over the next year."

There was evidence about Hugo's noncompliance with the child support provision of the district court's temporary order. Hugo did not pay child support for the children while he lived in Maine. The children visited him once over Christmas 2018 while he lived there. According to Kristen, Hugo sent tickets for the children's visit and that they had cell phones when they returned to Nebraska. Hugo did not begin paying child support until the end of June 2019. He was $6,290.49 behind on child support at the time of trial. Hugo clarified that the plane tickets for the children's visit were purchased by his mother, who works for an airline. He also indicated the cell phones were not purchased but leased monthly through his account.

Kristen testified about occasions when Hugo did not follow the temporary parenting time order. She also testified that Hugo did not follow the temporary parenting time order "at all" and that he would "pretty much come pick up the kids whenever he felt like it." Hugo testified that he "typically" did not take the children when it was not his scheduled parenting time.

Hugo had two convictions for driving under the influence (DUI) during the parties' marriage. He also had a third arrest for DUI that did not result in a conviction. When asked about this incident, Kristen testified that Hugo returned home around 5:30 a.m. with the children, that he did not call her from the police station, but that the children told her that Hugo was "going too fast and got pulled over" and that they had been in a police station.

The parties presented evidence about and testimony from their current romantic partners. Kristen had been dating her boyfriend for 2 years and 2 months at the time of trial. She testified that she has never "spent the night with him or slept with him or had sexual intercourse with him" while the children were present in the residence or in any other place where the children were present, which Kristen felt would be "inappropriate." Hugo disagreed with this testimony, and he testified that Kristen had had "multiple boyfriends" who had lived with her. Kristen agreed that she did date a couple of other men before dating her current boyfriend, but she testified that she did not live with any of them. Kristen's current boyfriend testified that he lives at a separate address from Kristen with his 13-year-old child (he has joint custody of the child with the child's mother). He testified that he has never spent the night in Kristen's home or had her spend the night in his home when the parties' children were present. He described the things that he does when spending time with the parties' children and testified that both he and Kristen had good relationships with the parties' children.

Hugo began dating his current girlfriend in January 2016 when she was 18 years old and he was 34. They have resided together since 2016, became engaged in October 2106, and have a child together born in January 2018. The girlfriend testified that her child with Hugo and the

parties' children have a "[v]ery happy" and "healthy" sibling relationship and that they "look very connected and bonded" in family photos submitted by Hugo and received into evidence. The girlfriend was expecting another child with Hugo due to be born in October 2020.

Kristen expressed her objections to Hugo "living with someone else and sleeping with them openly" during times when the children are staying with him. She objected to this aspect of his relationship with both his current girlfriend and another woman who lived with him previously (whom Hugo described as a "roommate" or a "tenant" and not a romantic partner beyond a period of about 2 weeks).

Kristen also testified about some apparent difficulties in the relationship between Hugo and his current girlfriend, based on email correspondence between the girlfriend's mother and Kristen. According to Kristen, the girlfriend filed a paternity action against Hugo and sought a protection order. Kristen testified that the emails "spell[ed] out" that the girlfriend's mother was "fearful for her daughter" and that the girlfriend "had pictures of [Hugo's] drugs." Hugo denied separating from his girlfriend at any point during 2019, testifying that she flew to Maryland for a 3-week vacation with her mother, during which time her mother "force[d] her" to file a paternity action against him. He was unaware of whether a protection order action had been filed, stating that he was never served with any papers for either action. The girlfriend confirmed filing a paternity action and a protection order action against Hugo while visiting her mother, also testifying that she was coerced by her mother into doing so. The paternity action was dismissed for lack of prosecution in January 2020. The girlfriend also testified that the statement in her mother's emails to Kristen about the girlfriend having taken "pictures of [Hugo's] drugs" was a lie by her mother.

Hugo testified that he had a great relationship with the parties' children. When asked to describe Hugo as a father, his girlfriend stated, "It's one of those things you can't really put into words. Those kids are absolutely in love with you."

Kristen feels that she currently has a good relationship with the children. Kristen disciplines the children by restricting video game and cell phone use. She testified about occasions when she and the parties' son had disagreements about him playing a video game. She testified that he would "get in [her] face" and that he once hit her, pushed her to the ground, tried to break her fingers, and bit her. The son has called or texted Hugo to pick him up from Kristen's care when he is unhappy with Kristen's discipline. Kristen has tried to limit the children's involvement in and knowledge of the divorce action, something she feels that Hugo has not done based on things they have later told her. Kristen also expressed concern about the children's access to Hugo's social media where he advertises his photography services for racy photo shoots.

Hugo agreed that the pictures on his social media of his photography are not necessarily appropriate for the children to view, but he testified that Kristen "controls their social media and their devices." During the course of his testimony, Hugo generally testified that Kristen has a poor relationship with the children, and he disagreed with her parenting style and discipline. According to Hugo, after obtaining temporary custody, Kristen "decided to ruin the relationship with the children." He testified that the parties' daughter now has depression, their son's grades have suffered, and he generally described the children as "suffering" and "not happy." He expressed particular concern about Kristen sometimes leaving the children home alone when she was at work, something she felt was appropriate given their current ages.

The parties testified about their ability to communicate and coparent. Kristen testified that the parties do not "get along at all when it comes to most things" and that Hugo has not cooperated with her in raising the children "to this point." Kristen offered an exhibit with an acrimonious text message to her from Hugo sent in January 2019. She testified that this message "reflect[ed] the type of communication that [she] had with [Hugo]." She described Hugo as "manipulative," controlling, and "narcissistic." She testified that he was not capable of coparenting with her.

Hugo testified that the parties used to "get along," "had a really good relationship," and "communicated all the time" before he left for Maine, but he agreed that they "don't get along at all now." He testified that since Kristen "took custody," she "took control of everything, and she doesn't want anything to do with amicable." He also described her as someone who "loves to manipulate situations" and "loves to lie."

On September 14, 2020, the district court entered a decree, dissolving the parties' marriage and dividing the marital estate. The court awarded Kristen sole legal and physical custody of the children, subject to Hugo's reasonable parenting time as set forth in the attached parenting plan (a similar schedule to the temporary schedule). In support of the custody award, the court noted evidence that:

> [Hugo] failed to support [Kristen] and the children while he resided in [Maine] . . . from October, 2018 to March, 2019. [Hugo] moved the family 21 times since the date of the marriage in 2006. The children were in five . . . different schools in a five . . . year period but since the date of separation, the children have resided in one . . . residence and attended one . . . school in one . . . school district. [Hugo] has two prior convictions for DUI (in one of the incidents the children were in the car), another DUI pending. [Hugo] moved to Maine "to be happy" and to "put himself first for once." As of the date of trial, [Hugo] was $6,071.74 in arrears in his child support. There is evidence that [Hugo] involves the children in the divorce proceedings. [Hugo] has lived in several locations during the pendency of this matter and [Kristen] provides a much more stable living environment for the children.

The court ordered Hugo to pay child support of $784 per month for two children, commencing on October 1, 2020, and $536 for one child. The court stated that any amount of child support due under the prior temporary order "shall not merge in this Decree but shall remain."

Hugo subsequently perfected his appeal to this court.

ASSIGNMENTS OF ERROR

Hugo asserts that the district court erred in (1) denying his request to have the parties' children testify in camera and (2) awarding sole custody of the children to Kristen.

STANDARD OF REVIEW

A trial court's ruling on a motion to conduct an in camera interview of a minor child in custody proceedings is reviewed for an abuse of discretion. See *Donscheski v. Donscheski*, 17 Neb. App. 807, 771 N.W.2d 213 (2009).

Generally, the control of discovery is a matter for judicial discretion, and decisions regarding discovery will be upheld on appeal in the absence of an abuse of discretion. *McGill Restoration v. Lion Place Condo. Assn.*, 309 Neb. 202, 959 N.W.2d 251 (2021).

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Seivert v. Alli*, 309 Neb. 246, 959 N.W.2d 777 (2021). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.*

In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Id.* However, when evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## ANALYSIS

*In Camera Interview of Children.*

Hugo asserts that the district court erred in denying his request to have the parties' children testify in camera.

In determining custody and parenting arrangements, the court is to consider the best interests of the minor child, one such factor of which is "[t]he desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning." Neb. Rev. Stat. § 43-2923(6)(b) (Reissue 2016). While the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). In those cases where the child's preference was given significant consideration, the child was typically over 10 years old. See *id.*

Initially, we note that while Hugo argues on appeal that both children were present outside of the courtroom, the record shows that only the parties' daughter was present. Next, we note that Hugo did not file a pretrial motion for an in camera interview of the children. Rather, the matter was addressed during the course of trial, initially in response to Hugo's attempt to admit exhibits that had not been timely submitted pursuant to the district court's pretrial order. Hugo also submitted a witness list the morning of trial. The court denied Hugo's request to have his daughter testify in camera as a discovery sanction based on Hugo's failure to list the children as witnesses in his answers to interrogatories and the late submission of his witness list. Hugo argues on appeal that Kristen's attorney was placed on notice of his intent to call the children as witnesses because he listed them on the witness and exhibit list he filed in July 2019. However, Hugo did not clearly present this argument to the court at trial.

During Hugo's direct examination by Kristen's attorney, he was asked about the document containing answers to interrogatories he provided during the March 2019 discovery hearing. He agreed that he had not listed the children in that document as persons with knowledge of the issues involved in the then pending action. He also confirmed that he turned in his witness list and exhibits

to the court the morning of trial, and he verified that the parties' daughter was present outside of the courtroom. Hugo testified that he thought it was reasonable to have the trial judge speak with the parties' daughter even though he had not listed her in his interrogatory answers and had not turned in his witness list to the court until that morning.

Prior to Hugo's cross-examination of his girlfriend, there was a discussion between him and the district court with respect to certain exhibits Hugo wished to offer, which had not been submitted according to the terms of the court's pretrial order. Hugo indicated that he wanted to present some evidence about Kristen's post-separation relationships. During this discussion, Hugo also referenced "text messages from the children." The court asked Hugo "how are you going to get this in . . . are you going to call the children." Hugo responded that the parties' daughter was present and "want[ed] to have an in camera interview" with the trial judge. When asked by the judge if he knew about "that request," Kristen's attorney indicated that he did not. The following exchange then took place:

[HUGO]: It's in the -- you have it. It's in the paper.

[KRISTEN'S ATTORNEY]: It's not in the interrogatory answers. He only lists [his girlfriend] in the interrogatory answers.

[HUGO]: It's in the witness list and everything.

THE COURT: [Kristen's attorney] needs to be notified if you --

[HUGO]: He has a witness list, and I have -- I have --

The district court reviewed a witness list filed by Kristen's attorney and verified with him which witnesses on that list he still intended to call and the fact that Kristen's attorney had not listed the children as witnesses on his list. The court also confirmed with Kristen's attorney that Hugo "didn't respond that the children know anything about this." The court then stated:

Okay. Well, she's not going to -- again, it isn't whether I want to interview her. It isn't whether she wants to be interviewed. I'm not involved in that part of it.

But [Kristen's attorney] is entitled -- he asked who knows about it? You did not list the children as someone who knows facts about this case. And he's not going to call the children, and you didn't list them as witnesses, so she's not going to testify.

It's not a matter of whether she's mature enough or whether she wants to. It's a matter of [Kristen's attorney], in preparing for trial, needs to --

Trial then proceeded with Hugo's cross-examination of his girlfriend. Later, while engaged in a discussion with the court, Hugo referenced the fact that "the children are not being allowed . . . to talk," the court reminded him that he did not "properly try to do that," to which Hugo responded, "Okay. That's fine, Your Honor."

After Kristen rested, Hugo informed the district court that he did not have any more witnesses but that he wished to testify himself. During his testimony, Hugo stated, "Everything that [Kristen] is saying right here is the complete opposite of what [Kristen and the children's] relationship is at home. That's why my daughter is here, because she wants to testify, but she's not being allowed." At that point, the court sustained a hearsay objection by Kristen's attorney. Hugo argued, "I'm not quoting her right now. I'm just saying that she's right here." He also stated, "She's here for a reason. I'm stating a fact." The court then stated, "[Kristen's attorney] has the

opportunity to know and prepare for that type of testimony. He wasn't put on notice." And, Hugo responded, "Okay. And that's fine. That's why she's not in here testifying. . . ." However, Hugo did not explicitly inform the court at any point that the daughter had a preference with respect to custody that she wished to share with the court.

During the above quoted exchange, Hugo made a vague reference to "the witness list." It is not clear whether he was referencing the witness list he submitted the morning of trial or the 2019 document filed with the court. It is also unclear whether Hugo may have been referring to Kristen's witness list, which her attorney clarified did not include the children. Regardless, Hugo did not pursue the matter to inquire on the record whether Kristen's attorney had received that 2019 filing. Nor did he bring the 2019 filing to the court's attention when Kristen's attorney confirmed to the court that Hugo had not listed the children in his answers to Kristen's interrogatories.

The district court's ruling on Hugo's request to have his daughter testify in camera appears to have been imposed as a discovery sanction rather than as a sanction for Hugo's failure to comply with the court's pretrial order. Pursuant to Neb. Ct. R. Disc. § 6-326(e)(1)(A), a party who has responded to a request for discovery with a response that was complete when made is under a duty to seasonably supplement his or her response with respect to any question directly addressed to the identity and location of persons having knowledge of discoverable matter.

A party's failure to answer properly served interrogatories or to seasonably supplement discovery responses may be grounds for sanctions imposed under Neb. Ct. R. Disc. § 6-337. *Eletech, Inc. v. Conveyance Consulting Group*, 308 Neb. 733, 956 N.W.2d 692 (2021).

Sanctions under § 6-337 exist not only to punish those whose conduct warrants a sanction, but also to deter those, whether a litigant or counsel, who might be inclined or tempted to frustrate the discovery process by their ignorance, neglect, indifference, arrogance, or sharp practice adversely affecting a fair determination of a litigant's rights or liabilities. *Id*. An appropriate sanction under § 6-337 is determined in the factual context of a particular case and is initially left to the discretion of the trial court, whose ruling on a request for sanction or a sanction imposed will be upheld in the absence of an abuse of discretion. *Id*.

In determining whether a sanction under § 6-337 is appropriate, relevant factors include the prejudice or unfair surprise suffered by the party seeking sanctions, the importance of the evidence which is the root of the misconduct, whether the court considered less drastic sanctions, the sanctioned party's history of discovery abuse, and whether the sanctioned party acted willfully or in bad faith. *Id*.

For preclusion of testimony as a sanction for noncompliance with a duty to provide supplemental responses under § 6-326(e)(1), § 6-337 does not require noncompliance with a prior order for discovery. See, *Eddy v. Builders Supply Co.*, 304 Neb. 804, 937 N.W.2d 198 (2020); *Norquay v. Union Pacific Railroad*, 225 Neb. 527, 407 N.W.2d 146 (1987).

We note that sanctions are also appropriate for a party's failure to comply with a pretrial order. The Nebraska Supreme Court has stated that it is appropriate for a trial court to schedule the completion of pretrial tasks and, upon the failure of the parties to meet the schedule or the task, to impose such sanctions as the facts may warrant. *Custom Fabricators v. Lenarduzzi*, 259 Neb. 453, 610 N.W.2d 391 (2000). Most pretrial orders usually provide for such a sanction for failure to provide witness and exhibit lists. Here, the February 2020 order notified the parties that witnesses

and trial exhibits were to be identified in writing by the parties not less than 10 days before trial and it warned that compliance with the order was expected and that "[f]ailure to comply with any provision may result in sanctions, the exclusion of evidence, and/or the striking of the certificate of readiness for trial." It also notified that the court "reserve[s] the right to impose such other requirements as it deems necessary to expeditiously resolve the case." Hugo failed to comply with this pretrial order.

Hugo argues that the district court's ruling yielded an unjust result because "his attempts to illustrate his concerns regarding his children's best interests were prohibited as hearsay." Brief for appellant at 21. Hugo had the opportunity to testify himself about his concerns, and he cross-examined some of the witnesses called by Kristen. His ability to elicit admissible information in the process was hampered in part by his unfamiliarity with how to navigate the rules of evidence. However, a pro se litigant will receive the same consideration as if he or she had been represented by an attorney, and, concurrently, that litigant is held to the same standards as one who is represented by counsel. *Bryant v. Bryant*, 28 Neb. App. 362, 943 N.W.2d 742 (2020). Under the circumstances of this case, we find no abuse of discretion in the district court's denial of Hugo's request to have the parties' daughter testify in camera, either as a discovery sanction and/or as a sanction for failure to comply with the terms of the February 2020 pretrial order.

*Custody Award.*

Hugo asserts that the district court erred in awarding sole custody of the children to Kristen. In support of this assignment of error, Hugo argues that certain findings by the court were not supported by the evidence. Specifically, he challenges the court's findings that he failed to support the children while he lived in Maine, moved the family 21 times since the date of the parties' marriage, had two prior DUI convictions (one incident occurring while the children were in his vehicle) and one pending DUI charge, moved to Maine "'to be happy'" and to "'put himself first for once,'" and had lived in several locations during the pendency of this case. He argues that these specific findings by the court were based on "inconsistent evidence, or no evidence at all" and that if the court had reviewed "the actual evidence presented," it "could have, and should have" awarded the parties joint physical custody. Brief for appellant at 18.

Section 43-2923(6) provides:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. For purposes of this subdivision, the definitions in section 43-2922 shall be used.

In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

"Joint physical custody means mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time." Neb. Rev. Stat. § 43-2922(12) (Cum. Supp. 2020). However, Nebraska statutes do not require the district court to grant equal parenting time or joint custody to the parents if such is not in their children's best interests. See *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009). Neb. Rev. Stat. § 42-364(3) (Cum. Supp. 2020) provides:

> Custody of a minor child may be placed with both parents on a joint legal custody . . . basis . . . (a) when both parents agree to such an arrangement in the parenting plan and the court determines that such an arrangement is in the best interests of the child or (b) if the court specifically finds, after a hearing in open court, that joint physical custody . . . is in the best interests of the minor child regardless of any parental agreement or consent.

Joint physical custody is neither favored nor disfavored under Nebraska law. *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). In fact, no custody or parenting time arrangement is either favored or disfavored as a matter of law. *Id.*

Hugo does not challenge the district court's finding that Kristen was fit, nor does he specifically argue that the award of sole custody to Kristen was not in the children's best interests. Rather, he challenges the specific findings of the court noted above, argues that these findings were not supported by the record and that the evidence instead supported an award of joint physical custody. We disagree. Hugo acknowledges that he did not pay child support while he lived in Maine, but he argues that "he could not work, and could not afford to pay support" at that time. Brief for appellant at 13. He points out that he began paying support after he returned to Nebraska and obtained employment. We have considered this evidence in our de novo review.

Hugo complains about the court's finding that he moved the family 21 times. Hugo points out that the evidence shows that the parties did not live together at all of the addresses on the list presented by Kristen at trial. We read the court's finding more as an assertion that the parties lived, either separately or together, at a number of locations during the course of their marriage. Hugo also complains about the court's finding that he lived in "several locations" during the pendency of the divorce proceedings. He points out evidence showing that he only lived in four of the eight locations on Kristen's list following their separation in 2015. The court's finding is not inconsistent with this evidence.

Hugo also complains of the court's findings with respect to his third arrest for DUI and his reasons for moving to Maine. With this and his other arguments, Hugo essentially challenges the credibility of Kristen's evidence. The parties presented conflicting evidence at trial, and we consider and give weight to the fact that the trial judge heard and observed the witnesses and

accepted one version of the facts rather than another. See *Seivert v. Alli*, 309 Neb. 246, 959 N.W.2d 777 (2021).

In our de novo review, we have considered the entire trial record and not just the conflicting evidence that the court clearly resolved in Kristen's favor. We find no abuse of discretion in the court's award of sole physical custody of the parties' children to Kristen.

CONCLUSION

The district court did not abuse its discretion in denying Hugo's request to have the parties' children testify in camera or in awarding sole physical custody of the children to Kristen.

AFFIRMED.